CITY OF NEW ORLEANS *v.* CITY OF BALTIMORE.—THE AMERICAN COLO-NIZATION SOCIETY AND THE SOCIETY FOR THE RELIEF OF DESTITUTE ORPHAN BOYS, Appellants.

The clause in the will of *John McDonogh*, prohibiting the division of the estate between the cities of New Orleans and Baltimore, held to be a condition contrary to law and to be reputed as not written.

A testator can order that the effects given or bequeathed by him shall not be divided for a certain time, which cannot exceed five years.  C. C. 1223.

The personal charge by the will on the cities to pay over to the American Colonization Society and the Society for the relief of Destitute Orphan Boys, a certain proportion of the revenues of the property bequeathed, did not create a mortgage or real right in favor of the societies on the property.

The bequests in favor of the societies are *quasi* usufructs, and as such, they can only last thirty years.  C. C. 607.

APPEAL from the Fifth District Court of New Orleans, *Eggleston*, J.
*J. J. Michel & Randell Hunt*, for the City of New Orleans.  *Clark & Bayne*, for the American Colonization Society ; *Duncan & McConnell*, for the Orphan Boys' Asylum, appellants.

SPOFFORD, J.  The right of either the City of New Orleans or the City of Baltimore to demand a partition of the property bequeathed to them as testamentary heirs of *John McDonogh* under universal title, after the lapse of five years from his death, cannot be seriously questioned.  C. C. 1222, 1223, 1506 ; 8 Annual, 249 ; 16 How. 412.

Several Articles of the Civil Code must be expunged before the Society for the Relief of Orphan Boys can be heard to object to a partition between the two cities in this case.

The cities having acquiesced in that portion of the judgment which assesses the present value of the "annuities" to the Orphan Boys' Society and the Colonization Society, the only question of substance left for us, so far as these societies are concerned, is, has the present value of these "annuities" been appraised too low.

The questions of *form* raised by the Colonization Society are untenable. The cities alone are entitled to agitate those questions; for, the property partitioned is theirs.  No part of *McDonogh's* estate existing at the time of his death was bequeathed to either of the societies who complain of the judgment ; nor was even an absolute legacy of money left to them. A personal charge was imposed upon the cities to pay over to the appellants a certain proportion of the variable future revenues of property bequeathed to the cities alone.  This created no mortgage or *real right* in favor of the societies on the property of the cities. Proudhon, 1 D'Usufruit, p. 56.

As it is out of the power of the societies to prevent a partition, and as they have no right in the property itself to be partitioned, they cannot complain of the mode or form in which that partition has been made.

Reverting then to the only question of substance, so far as these societies are concerned, we are of the opinion that, under no aspect of the case, has the present value of the so-called annuities been fixed too low.

If the continuance of those annuities were, as the Orphan Boys' Society seems to contend, inseparably bound up with the testator's command that his estate be held forever in indivision, the logical result would be that the annuities must fall with this illegal condition. The prohibition to divide the estate after five years from the death of the testator being reputed as not written, all the clauses whose vitality depends upon that prohibition would have to be reputed as not written also.

Under that view of the case, the societies have obtained far greater sums than they were entitled to by strict law, and, instead of being aggrieved, are under obligations to the cities for their liberality in acquiescing in the judgment.

But we do not find it necessary to decide that point, or to hold that the claims of these societies upon the cities cease with the partition. For, upon a careful examination of the provisions of our Code, we have come to the conclusion that the Legislature has so far assimilated bequests of this character to usufructs, as to limit their duration to thirty years from the testator's death. Under the title of usufructs, in the section which treats of their expiration, are the following Articles:

Art. 601. "The right of the usufruct expires at the death of the usufructuary."

Art. 602. "The legacy made to any one, of the revenues of a property, is a kind of usufruct, which also ceases and becomes extinguished by the death of the legatee, if the contrary has not been expressly stipulated. It is the same with all annual legacies, as pensions of alimony and the like."

Art. 607. "The usufruct which is granted to corporations, congregations or other companies, which are deemed perpetual, lasts only thirty years."

It seems to us that the intention was, not to make such bequests as these "annuities," usufructs in reality, for there is no transfer of possession to the usufructuary, but to make them *quasi* usufructs, only for the purpose of limiting their duration, and that by Article 607 the extreme limit to the bequests before us is thirty years. And so the District Judge held.

The revenues seem to have been appraised at a liberal figure. The manner of estimating the present value of the "annuities" by a calculation of interest at the rate of eight per cent., seems to be eminently just and equitable, in the absence of any positive provision of law as to the mode of making the calculation.

The statutory provisions upon the subject of the *rente foncière* and constituted annuities do not appear to a majority of the court to be applicable to a case of this kind.

We are, therefore, of the opinion, that the societies which have appealed are in no wise aggrieved by the judgment.

The City of Baltimore is an appellant as to one question only; and that is, whether in the partition, as between New Orleans and Baltimore, the latter city has any claim upon the former by reason of the disparity between the

NEW ORLEANS
v.
BALTIMORE.
legacies attempted to be created by the testator for the establishment of a school farm in Baltimore and an asylum for the poor in New Orleans, an annuity of one-eighth part of the entire revenues having been given for the former purpose until it should amount to $3,000,000, and a similar annuity for the latter until it should amount to $600,000.

If these bequests do not fall with the illegal injunction to keep the property in perpetual indivision, they must, at farthest, terminate at the expiration of thirty years, considered as charges upon one city in favor of the other. And, as neither of the sums proposed could be paid within that period out of one-eighth of the revenues, the question raised by the City of Baltimore becomes of no practical importance.

It is, therefore, ordered and decreed, that the judgment appealed from be affirmed with costs.

MERRICK, C. J. The opinion which I am about to read, was prepared previously to that adopted by my colleagues. This remark will account for the extended manner in which the questions at issue have been treated in our opinion, merely concurring.

This is a suit brought by the plaintiff for the partition of the property belonging to the succession of *John McDonogh,* deceased.

It is alleged in the petition by the City of New Orleans, that *John McDonogh* died in October, 1850 ; that after a few special legacies, he bequeathed " all the rest, residue and remainder of his estate, real and personal," unto the Cities of New Orleans and Baltimore, in equal proportions of one-half to each of said cities, subject to the payment of the following, among other annuities, to be paid out of the rents of the estate, viz, one-eighth of the net yearly revenue of rents of the estate during forty years, to the American Colonization Society for colonizing free people of color of the United States ; and the one-eighth part of the yearly revenue of the rents of the estate, to the Society for the Relief of Destitute Orphan Boys of New Orleans, until it shall amount to $400,000 ; that the executors of the will have been discharged from their trusts, and that the Cities of New Orleans and Baltimore are now in the possession of the property which he bequeathed them, which exceeds $2,500,000 ; that the good administration of the estate and the interests of the parties require that this property, held in common by said cities, should be divided, and that petitioner has a right to demand the same, and that it is important that the claims of the American Colonization Society and the Society for the Relief of Destitute Orphan Boys, should be ascertained and adjusted.

The City of New Orleans concludes its petition, by praying that the said societies should be made parties to the suit, and cited to present their respective claims under the will, and that the court should adjudge and determine upon said claims, and order and decree a partition of the estate to be made, &c.

The City of Baltimore, in its answer to the petition, puts at issue the right of the City of New Orleans to demand a partition under the will, and then claims, that if the court should be of the opinion that the action can be maintained, that it is entitled, according to the will, to one million of dollars, which is to be paid and deducted out of said estate, before the residue be equally divided.

The Society for the Relief of Destitute Orphan Boys, excepts to the action, because, as it alleges, that it appears from the will that the property referred

to in plaintiff's petition, was bequeathed to plaintiff and the City of Baltimore for the express uses, purposes and charities in said will fully detailed, and that among the same, the cities were charged and commanded to pay to this defendant one-eighth of the revenues arising from said estate, payable every six, and, at farthest, every twelve months, until the whole sum of the payments thus made to this defendant, should amount to the sum of $400,000, exclusive of any interest which might accrue thereon; that under said will, the cities were bound to pay to this defendant in manner and form directed by said will, the aforesaid sum, as a condition under which the bequest to the cities was made.

This defendant further pleaded, in support of its exception, that said cities have not paid to this defendant the particular legacy bequeathed unto them, and that, therefore, they cannot divide the estate, but are bound to hold and administer the same until the same shall be paid.

The Colonization Society answered, that it was true that *John McDonogh*, by his will, left his estate to said cities as universal legatee, or under an universal title, and this respondent $25,000 per annum for forty years, provided the eighth of the revenues of the estate should equal that sum; that the will gave seizin to said cities; that they have entered into possession of the same, and received its annual revenues; that respondents have accepted the legacy to them bequeathed, and are desirous of receiving the amounts thereof, as the same becomes due; that hitherto they have received nothing, though the net annual revenues have amounted to $25,000 each year since the death of said testator; that the same will continue to amount to said sum for the remainder of said forty years, by management in the terms of the will; that respondent denies the necessity or lawfulness of a partition, but should the same be decreed, then respondent demands that its claim to said legacy should be estimated at its present value and paid out of the mass of the estate, and that the said cities should account to them, for the annuities already due and payable.

The District Court ordered a partition to be made in kind between the Cities of New Orleans and Baltimore, as far as practicable; that the experts appointed to make the partition, also, report the present value of the annuity bequeathed to the American Colonization Society and report the amount thereof, together with the principles upon which they adjust the same, and report upon a proper provision for settling or paying the same, subject to the order of the court; and that, in the same manner, they report the present cash value of the legacy in favor of said Society for the Relief of Destitute Orphan Boys; and that all the rights of said legatees under the will be reserved for further adjudication in case of necessity.

Under this order, the experts proceeded to make partition of the principal part of the real estate belonging to the succession, amounting to one million four hundred and eight thousand eight hundred and eighty dollars. They allotted property in value, $704,440, to each city.

They reported the present value of the legacies to the American Colonization Society, and the Society for the Relief of Destitute Orphan Boys, at $84,230 27, each on the basis of eight per cent. compound interest. The report of the experts making a partition, was homologated, and the present value of the two legacies as reported by them, was also adopted, and the court decreed, that on the payment of said sum of $84,230 27, to each of said societies, said annuities or legacies be extinguished. The claim of the City of Baltimore against

the City of New Orleans to establish a *farm school* was rejected, and in like manner the claim of New Orleans against the City of Baltimore to establish an asylum for the poor of New Orleans, was also rejected.

The American Colonization Society and the Society for the Relief of Destitute Orphan Boys appealed. By consent of parties, the City of Baltimore also appears before us as appellant in relation to all moneyed claims between the two cities.

The plaintiff's counsel submit the following propositions for the consideration of this court, viz, 1st. "That the City of New Orleans has the right to demand a partition of the *McDonogh* estate between the City of New Orleans and the City of Baltimore; and that the division reported by the experts, approved by both cities and sanctioned by the judgment of the District Court, is just and equal."

2d. "That the legacies to the Colonization Society and to the Society for the Relief of Destitute Orphan Boys, is based upon the indivisibility of the estate and the scheme of administration projected by *John McDonogh* in his will, and that they cease to be binding on the division of the estate." And,

3d. "That if the validity of the legacies be not destroyed by the partition of the estate, the legacies must be considered a kind of usufruct, lasting only thirty years from *McDonogh's* death, and of the value at this time of $84,230 27 each, and that the cities are willing that a judgment be rendered in favor of the societies for that amount, in payment and extinguishment of the legacies, without regard to the legal effect of a partition on their validity."

The American Colonization Society sets forth in the brief some objections to the form of the proceedings in partition, but in the main that society and the Society for the Relief of Destitute Orphan Boys, controvert the foregoing propositions, and by considering them we shall dispose of the whole case except those questions between the two cities.

I. Has the City of New Orleans the right to provoke a partition?

The discussions which have arisen upon this will in two former cases, and the opinions of this court already pronounced upon other questions growing out of the same and incidentally reflecting on the question before us, as well as the luminous and learned arguments of the counsel who have argued this case, have freed the solution of the present question from all difficulty. See the case in 8th An. p. 174, and the case of the *Society for the Relief of Destitute Orphan Boys* v. *The Cities of New Orleans and Baltimore,* 12 An. 62.

In both of these cases, the right of the cities to make a partition of the property bequeathed to them, was strongly intimated, although, as just observed, the court was not directly charged with the decision of the question.

In the 8th Annual, Mr. Chief Justice Eustis, speaking for himself and Mr. Justice Dunbar, said: "There is one mode or condition, and it is that on which the District Judge has decided the case, the utter impossibility of compliance with which cannot be contested. It is that prohibiting the partition of the lands bequeathed to the Cities of New Orleans and Baltimore, and requiring their joint ownership to continue forever."

This was doubtless said in view of the positive provisions of the Civil Code on this subject. They are as follows: "Art. 1215. No one can be compelled to hold property with another, unless the contrary has been agreed upon; any one has a right to demand a division of a thing held in common by the action of partition."

"Art. 1220. It cannot be stipulated that there never shall be a partition of a succession or a thing held in common. Such stipulation would be null and of no effect."

"Art. 1221. Nevertheless the co-heirs can agree that there shall not be a partition of the effects of a succession for a certain limited time, and such an agreement will be valid; but it will be assimilated in this case to a contract of partnership between the heirs and subject to the same rules."

"Art. 1222. A donor or testator cannot order that the effects given or bequeathed by him to two or more persons in common shall never be divided, and such a prohibition would be considered as if it were not made."

"Art. 1223. But a donor or testator can order that the effects given or bequeathed by him, be not divided for a certain time, or until the happening of a certain condition.

But if the time fixed exceed five years, or if the condition do not happen within that term from the day of the donation, or of the opening of the succession, the Judge, at the expiration of this term of five years, may order the partition, if it is proved to him that the co-heirs cannot agree among themselves or differ as to the administration of the common effects."

These Articles of the Civil Code seem to bear directly upon the question before us, and must be held decisive unless there are some other provisions of law which control or are exceptional to them.

The American Colonization Society, in assuming that it is an heir recognized by being made a party to the suit (C. C. 1252), or that, as usufructuary, it is entitled to possession of a portion of the property in the partition (C. C. 1232), opposes nothing to the *right* of the parties to demand a partition. The objections are to the mode in which it is effected.

The Society for the Relief of Destitute Orphan Boys, without citing any statutory provisions exceptional to the Articles of the Code cited, rely (if I rightly apprehend its counsel) upon the following argument, viz:

That the destination given by *McDonogh* to the legacies to the cities for the benefit of the Society for the Relief of the Destitute Orphan Boys, has been declared to be valid and within the range of the powers and duties of its public authorities; that this destination is a part of the deed of conveyance, and, being lawful, the cities have no right in law to disregard or disobey; that the cities have accepted the donation *cum onere* and are bound to execute it; that the legacy never would have been made to the cities, except on the supposition that the distinction would be observed, and that now the cities cannot change the estate into a different form from that in which it was left them, and that the legacy is satisfactorily invested at the present moment and defendant cannot be deprived of this advantage.

Before considering these objections we will observe, that these societies are in a position in which they cannot be heard to urge that the two cities have forfeited any of their rights by the non-fulfillment of the conditions upon which the legacies were granted them, because such forfeiture would be fatal to the pretensions of the societies whose rights can be enforced only by maintaining the legacies to the cities in their integrity. C. C. 1703, 1546; *Girod's legatees* v. *Crossman*, 11 An. 497.

The Society for the Relief of Destitute Orphan Boys must have under the will:

1st. The *quasi usufruct* alleged by plaintiff; or,

2d. A right to an annuity as contended for by the defendant; or,

3d. Some other right either to and in the property bequeathed by *McDonogh*, or to claim the revenues personally of the executors or universal legatees.

If it is the *quasi usufruct* or even an absolute usufruct of one-eighth of the estate, it is no defence to the action of partition.

If it is an annuity or other personal charge, it is evident that the society can have no right to interfere to prevent a partition, for then their remedy would be a personal action against the executors or universal legatees for the annuity, as it should fall due. If the societies have some other right in the property bequeathed, the *jura in re*, then the partition cannot prejudice them, because their rights will follow the property into whose hands soever it may come, and the one-eighth of the rents can be exacted of such possessors. The mere inconvenience to the societies of collecting the revenues of two or more persons separately, instead of two jointly, is no sufficient answer to the action of partition. The five years from the death of the testator, having sometime since expired, we have no hesitation in saying that the action of partition must be maintained.

II. The second proposition of the plaintiff is, that the legacies to the two societies are based upon the indivisibility of the estate and the scheme of administration projected by *John McDonogh* in his will, and that they cease to be binding on the division of the estate. I do not think this consequence follows, whether we consider the legacy a *quasi usufruct* as contended for by the plaintiff, or as an annuity as maintained by the counsel for the Society for the Relief of Destitute Orphan Boys.

If it be a *quasi usufruct*, the view the most favorable to the plaintiff on this point, it cannot place the cities in a better condition than that of mortgagors. A mortgage is indivisible; still it does not prevent the children of the deceased mortgagor from making a partition of his estate. The mortgagee can sell any portion of the mortgaged property in the hands of any of his heirs, to pay his entire debt, nevertheless it does not prevent the *debt itself* from becoming divisible among the heirs of the mortgagor, each for his virile part. So here, by accepting the legacies to them, the two cities bound themselves to pay the charges upon the legacies in favor of the societies so far as the same can be considered valid and legal. C. C. 1606, 1603, 1751. The partition of the property between themselves cannot relieve them from this obligation, and perhaps the societies have also a mortgage upon the real estate to enforce it under Article 1626 of the Civil Code.

This Article is in these words, viz: "The heirs of the testator or the debtors of a legacy shall be personally bound to discharge it, each in proportion to the part that falls to him in the succession."

"They shall be bound by mortgage for the whole, to the amount of the value of the immovable property of the succession witheld by them."

If the heirs or universal legatees are personally bound, as it appears from the Articles of the Civil Code cited, how can the sale or partition of the property release them from such obligation?

Suppose the testator bequeaths a plantation and slaves to *A* and *B* and charges them with the payment of an annual sum to *C*, would the partition of the plantation, or even sale of it, destroy the personal obligation?

The texts of the Roman law cited by plaintiff's counsel, while they prove that the legacy of the fruits or of a part of the fruits of a farm or other real

estate did not prevent the sale of the property out of which the revenues were to arise, nevertheless establish that the personal obligation remained upon the vendors after such sale, to pay an amount equal to the annual revenue to be estimated according to the usual income derived from the property. The partition cannot have any greater effect than the sale of the property.

We will quote the whole of one passage, as it has some bearing on another branch of this case, as well as the one under consideration :

*Fundi Æbutiani reditus uxori meæ quoad vivat, dari volo. Quæro, an posit tutor hæredis fundum vendere, et legatario offerre quantitatem annuam, quam vivo paterfamilias, ex locatione fundi radigere consueverat ? Respondit posse.* Item quæro, an habitare impune prohiberi possit ? Respondit, non esse obstrictum hæredem ad habitationem praestandam. Item quæro, an compellendus, sit hæres reeficere praedium ? Respondit, si haeredis facto minores, reditus facti essent, legatarium recté desiderare quod ob eam rem deminutum sit. Item quæro, quo distat hoc legatum ab usufructu ? Respondit, ex his, quæ supra responsa essent, intelligi differentiam. Dig. xxxiii, tit. 2, l. 38 ; See also Domat, book 4, tit. 2, sec. 5, No. 4 ; Dig. xxx, Lex. 120. I conclude, therefore, that the partition cannot destroy the rights of the two societies. On this point, I differ in opinion from some of my colleagues.

III. The third proposition which plaintiff's counsel maintained is, that if the validity of the legacies to the two societies, be not destroyed by the partition of the estate, the legacies must be considered a kind of usufruct lasting only thirty years from *McDonogh's* death, and of the value at this time of $84,230 27 each.

The American Colonization Society has demanded in their answer, that if a partition be ordered, that it be paid the present value of the legacy to that society. The Society for the Relief of Destitute Orphan Boys, demand in their opposition to the report of the experts, that "the whole suit for a partition be dismissed as being premature; that if this be not done, that the report of the experts now before the court be rejected; and that it be ordered, adjudged and decreed herein, that the value at this time of the legacy due them, the Society for the Relief of Destitute Orphan Boys, is of the value of $400,000, and without the payment of which, said universal legatees of *John McDonogh* cannot have and maintain any action of partition of said estate between themselves." It is thus apparent, that both societies demand in the event a partition be decreed, that the present value of their legacies be awarded them by the decree of the court. The two cities consent to this demand and aver their willingness to make such payment. It is, therefore, essential to a correct determination of this case, that the third proposition of plaintiff's counsel should also be considered.

The will gives to the American Colonization Society, "an annuity for the term of forty years, counting from and after (the testator's) decease, of one-eighth part (or twelve and a half per cent.) of the net yearly revenues of rents of the whole of the estate as hereinbefore willed and bequeathed unto the Mayors, Aldermen and inhabitants of the Cities of New Orleans and Baltimore, but which one-eighth part of the net yearly revenues of rents of said estate as aforesaid, shall not entitle said American Colonization Society for colonizing the free people of color of the United States to receive or demand in any one year a larger sum than twenty-five thousand dollars, should one-eighth thereof amount to a larger sum." 8 An. p. 176.

The bequest to the Society for the Relief of Destitute Orphan Boys is in these words, viz:

"*Thirdly*. I give and bequeath to the Society for the relief of Destitute Orphan Boys of the City of New Orleans, in the State of Louisiana, (of which institution Beverly Chew was president on the 28th of April last, 1838,) for the express and sole purpose (and no other) of being invested in the purchase of real estate (say, lots of ground and houses and lots of ground) situate in the city of New Orleans and its suburbs, from which perpetual revenue from the rents of said real estate may be drawn for the support of said institution, or an annuity of one-eighth part (or twelve-and-a-half per cent.) off the net yearly · revenue of the whole of the general estate, as hereinbefore willed and bequeathed to the Mayors, Aldermen and inhabitants of the cities of New Orleans in the State of Louisiana, and of Baltimore, in the State of Maryland, which annuity of one-eighth part of the net yearly revenue of rents as above stated shall be set apart yearly or half yearly by the commissioners and agents of the general estate, (to be appointed as hereinafter set forth,) and deposited in some one or more of the banks in the city of New Orleans, (which pay an interest on money deposited with them,) until such time as said annuity shall amount to the sum of *four hundred thousand dollars*, (exclusive of any interest which may have accrued on it,) when it shall cease and be no longer paid."

It is apparent from the reading of these clauses, that the legacies in question are of the one-eighth of the annual revenues of the estate for a time to each of the societies.

Article 602 C. C. defines these bequests : "The legacy made to one, of the revenues of a property, is a kind of usufruct which also ceases and becomes extinguished by the death of the legatee, if the contrary has not been expessly stipulated.

"It is the same with all annual legacies, as pensions of alimony and the like."

Although this Article defines the legacy of the revenue of property to be a kind of usufruct, still it is not in all respects an usufruct. As shown in the text of the Roman Law cited, the legatee is not entitled to actual possession ; he cannot in case of sale of the property by the owner claim the actual revenues received but an equal amount of the same kind, and the debtor of the legacy is bound to indemnify the legatee for his acts by which the revenues are diminished. See also Dig. VII, tit. 1, L. 58. § 1. Ibid, XXXIII, tit. 2, L. 22.

Still the lawgiver has classed this species of legacy with the usufruct and consequently subjected it to the rules which he immediately prescribes in that and a subsequent Article for the duration of usufructs. In the 607th Article C. C. it is declared, that "The usufruct which is granted to corporations, congregations or other companies which are deemed perpetual, lasts only thirty years.

"If these corporations, congregations or other companies are suppressed, abolished or terminated in any other manner, the usufruct ceases and becomes united with the ownership."

That it was the intention of the legislature to limit the legacy of the revenues of property in this manner is apparent from the fact that this legacy contains so few of the essential requites of the usufruct proper that it can hardly be supposed that the Legislature introduced it in the place where it

is found except for the purpose of limiting its duration in the same manner as the usufruct proper.

Again, the limit here fixed is in harmony with the provisions in regard to the duration of the *rente foncière.* Art. 2759 provides, that "The rent charge, although stipulated to be perpetual, is essentially redeemable. But the seller may determine the terms of the redemption, and stipulate that it shall not take place until after a certain time, which can never exceed thirty years." See also 2767 C. C.

I conclude, therefore, that the partition does not defeat the right of the societies, but, that their right to recive the one-eighth of the revenues must be considered as limited to thirty years from the death of the testator, beyond which period it could not be recognized except by the sufferance of the cities, were the property even to be kept in a state of indivision.

But it is contended, that the present value of these legacies as estimated by the experts for the twenty-four years yet to run, does not rest upon any sufficient data, and that the two societies ought to be allowed much larger sums.

It must be observed, that the opponents have not adduced any testimony to show that a larger revenue might reasonably be expected from the property than that assumed by the experts, viz: sixty-four thousand dollars per annum, that is eight thousand dollars for each society. In the case recently before us between the cities and the Society for the Relief of Destitute Orphan Boys, we fixed the one-eighth of the net revenues received by the executors up to 30th June, 1856, a period of near six years, at $12,534 09. I am by no means prepared to say that the estimate formed by the experts who have an intimate knowledge of the situation of the property, the repairs required, its productiveness, &c., is not a fair one. If dissatisfied with this estimate it was incumbent on the societies to furnish testimony on which a different conclusion could be predicated. If this estimate be rejected, we are without proof to supply its place by any other. I shall, therefore, assume the estimate of the annual income made by the experts to be correct. It is equivalent to a revenue of *six per cent.* on $1,066,666 66⅔, which is the estimate furnished by the counsel for the Society for the Relief of Destitute Orphan Boys to the experts. It is based on the supposition, that the *cash* value of the estate is $1,066,666 66⅔. If we look into the inventory we shall find that the productive property does not exceed this sum.

Assuming that the probable income will reach $64,000 per annum, and yield each of the societies $8000, the question then arises, upon what rate of interest shall the present value of the annuities or *quasi usufructs* be estimated. The societies answer five per cent., for that is the legal rate of interest. The cities say no; money always commands the highest rate of conventional interest, and it is but fair that the value of the legacy should be estimated at eight per cent. interest. In favor of the first position is the presumption of the fairness of the estimate arising from a general law applying to all contracts where the parties have neglected to contract in regard to the rate of interest. In favor of the second is the fact, that for the last thirty or forty years money has not commanded a less rate of interest than eight per cent., and this is the rate adopted by the lawgiver in discounting the paper of the purchasers of property, not yet due, in making partitions. Civil Code 1264, Acts of 1853, p. 157.

As the Legislature has not positively prescribed the mode in which the calculation is to be made it is doubtless abandoned to the prudence of the Judge, and any calculation between the legal rate of interest and the highest rate of conventional interest probably might be adopted by him.   Hence, I do not feel called upon to dissent, although I think six per cent. interest the basis upon which the calculation ought to be made.

But in setting about the consideration of this subject, I start out on the principle that I am discussing *rights* which the Society for the Relief of Destitute Orphan Boys and the Colonization Society have to demand, and not a mere charity which the cities are willing to give.

As remarked by the counsel for the Society for Destitute Orphan Boys, these legacies are well secured, and the investment is safe as it now stands.   The income bequeathed the two societies partakes of the nature of the rent charge in some respects, and if Article 1626 C. C. should be held applicable to this case it is secured in the same way.   C. C., 2755, 2762.   I think the rate of interest adopted by the Code for calculating the value of the rent charge to be redeemed, being on an analogous subject, might be applied to the present case, and, that the present value of the annuities would be most safely ascertained on the basis of capital producing six per cent. interest.

Art. 2760, C. C., provides, that if the value of the property has been determined by the contract, the possessor who wishes to redeem cannot be made to pay anything beyond that value, and

Art. 2761, that " If there has been no valuation, the rent is considered *as fixed at the rate of six per cent. on the value*, and the lessee may pay the capital at that valuation."

Now, as the testator contemplated that the money for the Society for the Relief of Destitute Orphan Boys should be deposited in banks bearing interest and as when drawn out it was to be invested in real estate, we ought not to suppose that, as to that society, the annuity can be satisfactorily redeemed on the basis of a higher rate of interest than six per cent.   The law supposes, when invested in real estate, it will bear six per cent. interest for long periods, (2761) and we cannot say that this is not a safer estimate than that founded on the conjecture, that as money has for the last ten or twenty or even fifty years commanded eight and ten per cent. interest, it will, therefore, command eight per cent. for the next twenty-four years to come.   In 1844 the highest rate of conventional interest was reduced two per cent., and a further reduction may occur.   If it is proper to assume that the revenues are at the rate of six per cent. on the real estate, it is proper to adopt that basis for the estimate of the value of the revenues to be redeemed in present money.

Moreover, whatever calculation is adopted should be such that the society cannot lose by the redemption of the legacy.   To make the calculation upon the basis of a capital producing eight per cent. would necessarily subject the society to some loss, as there must be intervals between the collection and annual investment of the yearly interest or revenues, to say nothing of the cost of making collections and investments and the risk of loss of capital.   I see no sufficient reason why there should be a distinction between the societies as to the basis on which the calculation should be made.

I conclude then, that an examination of the inventory satisfies me that much of the real estate is unproductive, and that the conclusions of the experts, that the income should be taken at the rate of six per cent. per annum on

$1,066,666 66⅔, is reasonable, and, furthermore, that in finding the present value of the annuities the calculations should be made as upon a capital producing and which will continue to produce the same rate, viz: six per cent. interest.

At six per cent. the present value of the legacies to the societies for the period yet to run from the date of the report of the experts, twenty-four years, would amount to several thousand dollars more than allowed by the decree.

I should, therefore, prefer that the decree should be amended in favor of the societies to this extent. This disposes of all I have to say on the subject of the appeal of the American Colonization Society and the Society for the Relief of Orphan Boys.

The city of Baltimore is also appellant on her demand for $3,000,000 to establish the school farm. The will of *McDonogh* gives the one-eighth of the revenues of his estate to the city of Baltimore until they shall amount to $3,000,000 to establish a school farm for the destitute poor of Baltimore and other maritime cities, &c. See will, 8 An. p. 178. It gives in like manner to the city of New Orleans also one-eighth of the revenues of the general estate until they shall amount to *six hundred thousand* dollars, for the purpose of establishing an asylum for the poor of both sexes and of all ages, castes of color, &c. See p. 176–7.

From what I have already said, these *quasi* usufructs, as a charge upon each city in favor of the other, cannot last longer than thirty years from the death of *McDonogh*. The cities stand before us, then, as having equal rights upon each other. Under Article 1293 C. C., there is no reason why each city should not be charged on its own portion of the estate for the payment of the whole annual legacy due itself. They, as well as the societies, will then each become bound to the States of Louisiana and Maryland, or the heirs at law of *John McDonogh*, for the substantial performance of the conditions, as far as legally imposed by the will upon these legacies. 11 An., 497.

COLE, J., concurred in this opinion.