Rehearing refused by Division B, composed of DAWKINS, LAND, and LECHE, JJ.

(99 South. 22)

No. 26318.

## LE GOASTER et al. v. LAFON ASYLUM et al.

### In re LE GOASTER et al.

(Nov. 27, 1923. Rehearing Denied by the Whole Court Jan. 28, 1924.)

*(Syllabus by Editorial Staff.)*

**1. Executors and administrators ⟜289—Succession; debts of deceased and succession charges held properly payable before legacies.**

Children of a usufructuary were entitled to no relief against the holder of the naked ownership on the ground that the proceeds of movable property of the succession were used to pay debts and mortgage obligations of deceased and the law charges and costs of the succession; the debts of deceased and succession charges being payable before the legacies and primarily out of the personal property, in view of Civ. Code, art. 584.

**2. Life estates ⟜17—Use of proceeds of personalty subject to usufruct for extraordinary repairs to immovable property held not to give right of reimbursement.**

That the proceeds of personalty subject to usufruct were used for extraordinary repairs to immovable property, also subject to the usufruct, *held* to give no right to be reimbursed under Civ. Code, art. 576.

**3. Life estates ⟜17—No reimbursement for revenues used to improve property when owner not responsible.**

In view of Civ. Code, art. 594, the children of a deceased usufructuary *held* not entitled to be reimbursed for revenues of the immovable property subject to the usufruct used for improvement thereof and for construction of buildings, where it was not alleged that defendant owner made such improvements.

**4. Life estates ⟜17—What advances usufructuary may recover from owner, enumerated.**

The only advances which a usufructuary may recover from the owner, and for which he may detain the estate until reimbursed under Civ. Code, art. 625, are: First, repairs which the owner has refused to make, unless made necessary by the usufructuary's fault; second, extraordinary charges imposed on the thing subject to the usufruct if such charges augment the value of the property; and, third, advances which the universal usufructuary may have been obliged to make out of his own funds to

discharge the debts of the succession, in view of articles 576, 579, and 585.

**5. Mortgages ⊜➣163(1)—Effect of filing evidence of claim by legatees of annuities stated.**

That just before filing suit 14 years after a testator's death, legatees of annuities caused the evidence of their claim to be recorded in the mortgage office, *held* not to give them a preference over pre-existing creditors of one given the ownership of property, but to give them a preference over future creditors and a mortgage of which third persons must take notice from the date of recordation, in view of Civ. Code, arts. 1444, 1449, 1456, 1459, 1633, 3273–3275.

**6. Wills ⊜➣826(2)—Existence of mortgage lien held not to entitle legatees to enjoin sale of property by legal owner.**

That legatees of annuities have a mortgage on the property from the date of recordation of their claim *held* not to entitle them to enjoin the owner of the legal title from selling the property.

**7. Wills ⊜➣821(3)—Legatee of annuity has mortgage on immovable property.**

While an annuity is a personal obligation and does not import a mortgage unless stipulated in the grant, in view of Civ. Code, art. 2797, article 1633 grants such a mortgage upon all the immovable property of the succession to secure the legacies, for which the heir is personally bound.

Suit by Clemence Le Goaster and another against Lafon Asylum and others for an injunction. Judgment for defendants, and relators pray certiorari and mandamus. Application denied.

E. M. Cahn, of New Orleans, for relators.

Delvaille H. Theard, of New Orleans, for respondent Judge and defendants.

By Division C, composed of OVERTON, ST. PAUL, and THOMPSON, JJ.

ST. PAUL, J. Aimee Le Goaster died in 1908, leaving a large estate which included the immovables about which this controversy arises. She left the usufruct of the whole to her brother Erasme Le Goaster, father of the relators, and the *naked ownership* thereof to the defendant asylum. She also left two annuities, one of 15,000 francs to the first named relator and one of 3,600 francs to the last named.

Erasme Le Goaster died in 1922, leaving relators as his sole heirs. The usufruct having expired by his death, the defendant asylum was about to sell said immovables, having now become *full owner* thereof under the first clause of article 625, C. C., reading as follows:

"When the usufruct has expired it returns to and becomes again incorporated with the ownership; and from that time the person who had only the naked ownership, begins to enter into a full and entire ownership of the thing. * * *"

Whereupon plaintiffs (relators) sought an injunction restraining the sale upon two grounds:

(1) As heirs of their father they allege that, during the usufruct (their father residing abroad and they being minors), "large sums of money were expended out of the rents and revenues of said real property and proceeds of personal property, all subject to said usufruct; which funds properly inured to their father as usufructuary, but of which no accounting has ever been received by their said father or by petitioners, his heirs"; that said expenditures were made for "extraordinary repairs, reconstructions, new buildings and improvements, all of which materially augmented the value of the property subject to said usufruct; and likewise for debts and mortgage obligations of the deceased, Miss Aimee Le Goaster, as well as law charges, succession fees and costs, all aggregating over $50,000 (of which they can give no details, but) for which they are entitled to be repaid and reimbursed in full." And for reason why they are entitled to the injunction prayed for, they rely (in their brief) on the second and last clause of article 625, C. C., aforesaid reading as follows:

" * * * Nevertheless, the usufructuary or his heirs have the right to *retain possession* of

the thing subject to the usufruct, until they have been fully repaid for all expenses and advances for which they have, by law, recourse against the owner or his heirs."

(2) As legatees of annuities they claim a *mortgage* on said immovables by virtue of the last clause of article 1633, C. C., which article reads as follows:

"The heirs of the testator, or other debtors of a legacy, shall be personally bound to discharge it, each in proportion to the part that falls to him in the succession.

"They shall be bound by *mortgage* for the whole, to the amount of the value of the immovable property of the succession withheld by them."

## I.

[1] In so far as the petition complains that the proceeds of the movable (personal) property of the succession was used to pay the debts and mortgage obligations of the deceased, Aimee Le Goaster, and the law charges and costs of her succession, it is so wholly void of merit as to require no further notice. The debts of the deceased and the succession charges must, of course, be paid before the legacies, and primarily out of the personal property. *Nemo dat qwod non habet.* C. C. art. 584.

[2] Equally so as to the complaint that the proceeds of personal property subject to the usufruct were used for extraordinary repairs to the immovable property also subject to the usufruct. Under article 576, C. C., the *owner* was not obliged to make such repairs, but the usufructuary had the right to do so at his own expense, and recover his outlay at the expiration of the usufruct, but *without interest.* Coleman v. Poydras Asylum, 17 La. Ann. 325. Manifestly where there is personal property subject to the usufruct, and for which the usufructuary must account, it is more logical to make the extraordinary repairs with the proceeds of such personal property; the obligation to account being then extinguished by the right to be reimbursed, and the increased revenues of the immovable property, thus augmented in value, compensating for the loss of revenue from the personal property so used. This complaint is a mere grasping at straws; the more so since it is not alleged (presumably because it is not so) that this was done by defendant.

[3] As to the use of the *revenues* of the immovable property subject to the usufruct, for the *improvement* thereof and the construction of new buildings thereon, it will be observed that the petition religiously refrains from stating that *defendant* made such improvements and new constructions, or was in possession of said immovables during the usufruct; presumably because this was not so, and because, on the contrary, the *usufructuary* is presumed to have been in possession thereof either through himself or through his agents. At any rate, it is *not alleged* and it is *not to be presumed* that defendant was in possession.

And if the improvements and new buildings now complained of were made by the usufructuary or by his agents, or with his knowledge and consent, then he has no right to reclaim them from defendant. Article 594, C. C., reads as follows:

"At the expiration of the usufruct, the usufructuary has no right to claim any compensation for the improvements which he contends he has made, although the value of the thing may have increased by such improvements.

"The usufructuary is bound at the expiration of his usufruct, to abandon, without compensation, not only the buildings and other works which he may have constructed upon the property, whether they have or have not foundation in the soil, but all other movable things which he may have attached to it permanently.

"Nevertheless, he or his heirs may take away the looking glasses, pictures, statues and other ornaments, which he may have placed there, and which are fastened by plaster, lime or cement, but under the obligation of re-establishing the premises in their former situation."

And if, on the other hand, these improvements and new constructions were made without the knowledge and consent of the usufructuary, but by his agents or by third

persons, in fact *by any one other than the defendant*, then the usufructuary and his heirs must look for reimbursement to such agent or third person and not to the defendant; for it would be a most extraordinary state of affairs, if a usufructuary might by negligence or laches or inaction saddle upon the owner of the property subject to the usufruct all sorts of charges not authorized by the owner, and for which, if *deliberately* put there, he could not recover. C. C. art. 594.

[4] To make a long story short, the only advances which a usufructuary may recover from the owner, and for which he may detain the estate until reimbursed, under C. C. art. 625, are these:

(1) *Repairs* (of any extraordinary nature) for which the usufructuary may advance the cost, *after the owner has refused to make them;* unless made necessary by the fault of the usufructuary. C. C. art. 576.

(2) Extraordinary *charges, imposed* (by law) on the thing subject to the usufruct, if such charges *augment the value* of the property. C. C. art. 579.

(3) *Advances* which the universal usufructuary may have been obliged to make out of his own funds to discharge the debts of the succession. C. C. art. 585. (And on all the foregoing he is entitled to no interest; but to the capital only.)

We therefore fail to see wherein petitioners even set forth a cause of action against defendant, in this part of their complaint. And certainly an injunction will not lie upon allegations which set forth no cause of action.

## II.

As to the mortgage claimed by plaintiffs as legatees of annuities, the matter stands thus: C. C. arts. 1444, 1449, allow the creditors of a succession, and the legatees to demand a *"separation of patrimony";* that is to say, that the effects of the succession be kept distinct from those of the heir to the end that they may be paid in preference to the creditors of the latter. Likewise the creditors of the heir have the right to demand the same as to the property of the heir. C. C. art. 1459. In either case such demand must be made within three months after the opening of the succession. C. C. art. 1456. Otherwise the right is lost, and the mingling of the patrimonies puts the creditors of the succession (including legatees), and of the heir, upon an equal footing, both as to the property of the succession and as to that of the heir. See White v. Blanchard, 19 La. Ann. 59; also, James v. Hynson, 21 La. Ann. 566.

Again, C. C. art. 1633, above quoted, gives to the legatees a *mortgage* on the effects of the succession; but C. C. art. 3275 provides that—

"Creditors and legatees who demand a partition of the patrimony of the deceased, * * * preserve their privilege, as against the heirs or representatives of the deceased, on the immovables of the succession, only by recording the evidence of their claims against the succession within three months after it is opened. * * *"

In Ogle v. King, 22 La. Ann. 391, and in Succession of Dupuy, 33 La. Ann. 277, 284, it was held that C. C. art. 1633 (formerly article 1626) conferred no mortgage as against *third persons* unless the claims of the legatee be recorded. But in Doyal v. Doyal, 23 La. Ann. 97, it was held that the mortgage granted by C. C. art. 1633, need not be recorded as against the *heirs* of the deceased.

Now there is seemingly no conflict between the three last named cases; but there is apparently a conflict between the Doyal Case in 23 La. Ann. and the cases in 19 La. Ann. 59 (White v. Blanchard) and 21 La. Ann. 566 (James v. Hynson).

For if, as said in the cases in 19 and 21 La. Ann., the mingling of the patrimonies puts the creditors of the succession and of the heir on an equal footing, so that the creditors of the succession "have lost their right

to the property of the succession as distinct from that of the heir" (21 La. Ann. 566), then to allow the mortgage to be effective, and therefore capable of recordation, against the heir, is clearly to give it effect as to all persons *thereafter*.

But the conflict is more apparent than real; for it is strictly in accordance with C. C. arts. 3273 and 3274 (as amended by Act No. 45 of 1877), that a mortgage or privilege to give a preference over *pre-existing* claims should be recorded within a given delay, but that as to *future* claims it must be given full effect from the time of its recordation.

And this we apprehend to be the true meaning of the law, and the proper way to reconcile the apparent, but not real conflict between these several decisions and the various articles of the Code.

### III.

[5] We find from an exhibit forming part of the transcript, that just before filing their suit for injunction, plaintiffs caused the evidence of their claim to be recorded in the mortgage office. We have no hesitation in holding that this recordation gave them no preference over *pre-existing* creditors of the defendant, if any; but that it does give them a preference over *future* creditors, and a mortgage of which third persons must take notice *from the date of recordation*.

[6] But the fact that plaintiffs have a mortgage on the property from the date of recording their claim does not, however, entitle them to enjoin the sale of the property.

In White v. Blanchard, 19 La. Ann. 62, in Robinson v. Haynes, 19 La. Ann. 132, and in James v. Breaux, 26 La. Ann. 245, it was held that the holder of a mortgage could not enjoin even the *judicial* sale of the mortgaged property, because he could not possibly be injured thereby. In Smith v. Hoey, 28 La. Ann. 96, it was again so held; and it was further held that a voluntary (nonjudicial)

sale "in no manner relieved the property of prior incumbrances."

We cite these cases simply because we find them; and not because we think it necessary to cite authority on a proposition so very obvious. Manifestly a voluntary sale of the property of defendant cannot prejudice plaintiffs; and manifestly then they cannot complain of such sale, or stop it by injunction. Of course, the property continues subject to their mortgage.

The trial judge refused the injunction herein sought; and we think the refusal was correct.

### Decree.

The preliminary writs herein issued are therefore recalled, and relators' application is now denied at their cost.

### ADDENDUM.

By Division C.

Since the above opinion was written, we have been furnished with an additional brief in which our attention is called to C. C. arts. 605, 607, and Female Orphan Asylum v. Young Men's Christian Association, 119 La. 278, 44 South. 15, 12 Ann. Cas. 811. In these we find nothing which conflicts with the opinion as written.

[7] It is also urged that an annuity is a *personal* obligation, and that the grant of an annuity does not import a *mortgage* unless stipulated in the grant. C. C. art. 2797. But the answer to this is that C. C. art. 1633, grants such a mortgage upon all the immovable property of the succession to secure the legacies for which the heir is *personally* bound.

### FURTHER ADDENDUM.

By Division C.

Since the first addendum was written, we have been favored with additional briefs, into which we will not enter further than to say that New Orleans v. Baltimore, 13 La. Ann. 162, was decided by a divided court (Merrick,

C. J., and Cole, J., dissenting); and the theory was that the legacy was *uncertain as to amount*, and imposed only a *personal* obligation on the universal legatees; citing Proudhon de l'usufruct, vol. 1, p. 56, which holds simply that *and no more*.

But in so far as the case holds that the personal obligation to pay an annuity does not give rise to a mortgage, it *overrules itself* because in conflict with the statutory provisions of C. C. art. 1633, unless the meaning was that the legacy, by reason of the uncertainty, lacked the essentials of an *annuity* in that the amount for which it was redeemable could not be ascertained. C. C. art. 2796.

Rehearing refused by the WHOLE COURT.