**TEXACO, INC.**

**v.**

**SHAW–TROSCLAIR FABRICATORS, INC., et al.**

**Civ. A. No. 85–3251.**

United States District Court, E.D. Louisiana.

April 1, 1987.

Philip K. Jones, Jr., Anne E. Tate, Liskow & Lewis, New Orleans, La., for plaintiff.

Merrill T. Landwehr, New Orleans, La., Kenneth Watkins, Houma, La., for defendant Terrebone Bank & Trust Co.

Emile A. Wagner, John F. Landrum, New Orleans, La., for defendant Southern Imperial Coatings.

ROBERT F. COLLINS, District Judge.

This matter is before the Court based on a Joint Stipulation of Facts and a Supplemental Joint Stipulation of Facts submitted by Terrebonne Bank and Trust Company of Houma, Louisiana (TBT) and Southern Imperial Coatings, Inc. (Southern). Consequently, there is no factual dispute between the parties. Final arguments were heard on March 25, 1987.

*Facts*

This litigation initially began as three separate interpleader actions filed by Texaco, Inc. (formerly Getty), Chevron U.S.A., and Cities Service Oil & Gas Company. All of these companies owed money to Shaw–Trosclair Fabricators, Inc. (Shaw–Trosclair) for various oil well type construction projects which Shaw–Trosclair had fabricated and delivered. The companies withheld payment because of the filing of numerous liens and lawsuits by subcontractors of Shaw–Trosclair. The three interpleader actions were then instituted and eventually consolidated. All parties to these consolidated actions have settled their claims except one lien claimant, Southern, and TBT. TBT stands in the position of Texaco as an owner of an oil well platform upon which Southern claims a lien. Southern was a paint supplier to Shaw–Trosclair. Shaw–Trosclair used the paint on oil well platforms that it built for Texaco. The sum of $35,000.00 has been deposited in the registry of the Court and is claimed by both parties.

This action involves three wells. The first well is located on a Getty lease with the United States Department of the Interior, particularly described in the property description found in Joint Exhibit A. On this well, hereinafter referred to as "Well A," there remains an unpaid principal invoice balance of $2,632.65. Supplies destined for Well A were delivered to Shaw–Trosclair through August 23, 1984. On May 8, 1985, Southern recorded a lien against Well A in M.O.B. 150, folio 690, in the mortgage records of Plaquemines Parish. Southern filed suit on the lien on March 21, 1986.

A second well at issue herein is located on a Getty lease with the United States Department of the Interior, particularly described in the property description found in Joint Exhibit B. On this well, hereinafter referred to as "Well B," there remains an unpaid principal invoice balance of $23,080.96. Supplies destined for Well B were delivered to Shaw–Trosclair through August 31, 1984. Southern recorded a lien against Well B on May 8, 1986 in M.O.B. 150, folio 665, in the mortgage records of Plaquemines Parish and filed suit thereon on March 21, 1986.

The third well at issue herein is also located on a Getty lease with the United States Department of the Interior, particularly described in the property description found in Joint Exhibit C. On this well, hereinafter referred to as "Well C," there remains an unpaid principal invoice balance of $2,724.60. Supplies destined for Well C were delivered to Shaw–Trosclair through September 13, 1984. On May 8, 1985, Southern recorded its lien against Well C in M.O.B. 150, folio 631, in the mortgage records of Plaquemines Parish. Southern filed suit on this lien on March 21, 1986.

The Southern liens were recorded roughly nine and one-half months after the last supply of materials for Wells A and B, and roughly nine months after the last supply for Well C. Suit was filed roughly one year and seven months after the last supply of materials for all three wells.

Southern has accordingly recorded liens and sued Getty, as owner, pursuant to the Louisiana Oil Gas and Water Wells Act, LSA–R.S. 9:4861 *et seq.* Texaco, the successor in interest to Getty by reason of merger, has brought the lien claims into the present consolidated interpleader proceedings. For purposes of clarity, the Court will use "Getty" to refer to either Getty or Texaco, as appropriate, with respect to ownership of the platforms or obligations under the Getty–Shaw–Trosclair contract.

TBT, as assignee, has claimed from Getty receivables due Shaw–Trosclair for the fabrication of the three platforms. TBT's position is adverse to Southern because any

amounts due TBT as assignee will be reduced by the amount of Southern's claim. TBT asserts that the lien claim of Southern is untimely.

The factual stipulations generally provide that in the event that Southern prevails on the legal arguments of prescription and applicability of the Oil Wells Lien Act, then Southern would be paid the principal amount of its claim out of the proceeds deposited into the registry of the Court. Conversely, if TBT prevails on the legal arguments of prescription or the applicability of the Oil Wells Lien Act, then it should get all of the proceeds on deposit with the Court.

*Law*

■ The Court must first examine whether the Louisiana Oil Wells Lien Act, La.Rev.Stat. 9:4861 *et seq.* (The Act) is applicable to wells and structures located on the Outer Continental Shelf beyond Louisiana territorial boundaries. To do so, the Court must refer to the history of this body of law.

In 1916, the Louisiana Legislature extended protection to those who performed work or furnished materials in the exploration, drilling or production of oil and gas by granting a lien and privilege on the wells and appurtenant property in question. The Act provides in pertinent part that:[1]

> Any person who performs any labor or service in drilling or in connection with the drilling of any well or wells in search of oil, gas or water, or who performs any labor or service in the operation or in connection with the operation of any oil, gas or water well or wells, or performs any labor or service in the construction, operation, or repair or in connection with the construction, operation, or repair of any flow lines or gathering lines, regardless of their length, which are attached to or connected with the oil, gas or water well or wells, and any pipeline owned by the producer, operator or contract operator of the well, has a privilege on all oil or gas produced from the well or wells, and the proceeds thereof inuring to the working interest therein, and on the oil, gas or water well or wells and the lease whereon the same are located, and on all drilling rigs, standard rigs, machinery, pipelines, flow lines, gathering lines and other related equipment, including, but not limited to, monitoring, measuring, metering and control equipment, appurtenances, appliances, equipment, buildings, tanks, and other structures thereto attached or located on the lease, and rights-of-way in the case of a gathering line, flow line or other producer, operator or contract operator owned pipeline for the amount due for labor or service, in principal and interest, and for the cost of preparing and recording the privilege, as well as ten percent attorney's fees in the event it becomes necessary to employ an attorney to enforce collection.

This statute confers lien privileges to laborers and providers of services whose work was done "in drilling or in connection with the drilling of any well," or "in the operation of any oil, gas or water well."

TBT argues that the case of *P.H.A.C. v. Seaways International,* 403 So.2d 1199 (La.1981) stands for the proposition that The Act is not applicable to producing wells outside the State of Louisiana and that it is controlling in this issue. That case involved a materialman's lien on a living quarters unit that was constructed in St. Mary Parish and transported to the Outer Continental Shelf. *P.H.A.C.* held that The Act "does not purport to affect producing wells outside the State of Louisiana" and that it was not designed "to govern the case where production equipment is constructed for use completely out of this state and on the high seas." 403 So.2d at 1202.

*P.H.A.C.,* however, is distinguishable from the instant case by virtue of the fact that the living quarters unit in *P.H.A.C.,* while built in Louisiana, was transported to a location adjacent to the State of Texas. Under the Lands Act, Texas law rather than Louisiana law applied, and *P.H.A.C.*

1. The Act has subsequently been amended slightly. *See* La.Rev.Stat.Ann. § 9:4861 (West Supp.1987). This amendment is not relevant to the instant case.

should be limited to cases involving oil leases located off the coasts of states other than Louisiana. *St. Mary Iron Works, Inc. v. McMoran Exploration Co., et al.,* rev'd on rehearing, 809 F.2d 1130 (5th Cir.1987). This position is concurred in by a Louisiana Court of Appeals which, in *Louisiana Materials Co., Inc. v. Atlantic Richfield Co.,* 493 So.2d 1141 (La.1986), held that:

> [t]he property in question in *P.H.A.C.* was located off the *Texas* coast, and, therefore, would not be subject to any Louisiana law. Any attachment of property in that case should have been accomplished by means of Texas law.
> We conclude that [Oil] Well Liens Act is applicable to that property located on the Outer Continental Shelf off the Louisiana coast pursuant to 43 U.S.C. § 1333(a)(2)(A).

(emphasis in original). *Accord, Genina Marine Services, Inc. v. ARCO Oil & Gas Company,* 499 So.2d 257 (La.App. 1st Cir. 1986).

The Court must next determine whether Southern's claims have prescribed under The Act. Ever since the enactment of Section 9:4862 in 1928, the jurisprudence has indicated that the recordation period set forth in the section was not a prescriptive period. Rather, it related merely to the priority of the oil well lien as against other security interests in the well and lease property. The statute did not require recordation of the lien at any time as against the owner. *See Continental Casualty Co. v. Associated Pipe and Supply Co.,* 310 F.Supp. 1207 (E.D.La.1969), *affirmed,* 447 F.2d 1041 (5th Cir.1971). In that case, the Fifth Circuit commented on the 90–day recordation period contained in the forerunner to the present statute:

> "The clear implication is that if you choose not to record you will lose that special ranking of your privilege but not your lien. Nothing in the statute suggests anything to the contrary ... The legislature could have specifically provided that registration was required as it did in the Private Works Act but it did not choose to do so. Consequently, since

the statute does not so provide, recordation is not required."

310 F.Supp. at 1218. *Accord Beacon Gasoline Co. v. Sun Oil Co.,* 455 F.Supp. 506 (W.D.La.1978).

These decisions are in accord with the many Louisiana cases that construe comparable lien statutes. The conclusion is that where a statutory period is given in order to determine the priority of a particular lien, failure to record within that time forfeits only the priority and not the lien itself. *See Conservative Homestead Ass'n v. Ullrich,* 182 La. 806, 162 So. 628 (1935) (municipal paving lien); *Alcus v. Parkside Realty Co., Inc.,* 181 La. 773, 160 So. 409 (1935) (municipal paving lien); *Robinson–Slagle Lumber Co., Inc. v. Rudy,* 156 La. 174, 100 So. 296 (1924) (Private Works Act predecessor); *LeGoaster v. Lafon Asylum,* 155 La. 158, 99 So. 22 (1923) (mortgage on succession property accruing in favor of legatees of annuities).

The United States Fifth Circuit Court of Appeals, in affirming the *Continental Casualty* district court decision, so understood this rule and applied it to The Act:

> The rule in Louisiana is that where a statute grants a priority to a lien recorded within a certain time, failure to record within that time forfeits the priority only. If filed later, it is given effect from the date of recordation.

447 F.2d at 1054.

*Continental Casualty* and *Beacon Gasoline* were later ratified by a Louisiana state court in *I.E. Miller of Eunice, Inc. v. Source Petroleum, Inc.,* 484 So.2d 239 (La. App. 3d Cir.1986). In *Miller,* the lien was filed eight months after the services were rendered. There, the Louisiana Third Circuit held that the failure to record within the ninety-day (now one hundred and eighty day) period did not invalidate the lien against the owner:

> We agree that failure to record forfeits the priority of the lien only and that if the privilege is filed later it should be given full effect from the date of recordation, losing only its superior rank.

484 So.2d at 242.

The *Miller* decision contradicted the decision rendered by the Louisiana Fourth Cir-

cuit Court of Appeals in *C–Craft Marine Services, Inc. v. Llog Exploration Co.*, 470 So.2d 241 (La.App. 4th Cir.1985), *writ denied*, 472 So.2d 921 (La.1985). There, the court held that the privilege created by Section 4861 is lost altogether if notice of the lien is not recorded within one hundred and eighty days.

The Louisiana Supreme Court granted writs in the *I.E. Miller* case and then consolidated that proceeding with the *Louisiana Materials* case from the Louisiana Fourth Circuit Court of Appeals. In *Louisiana Materials*, the Fourth Circuit had followed *C–Craft* and held that the 180–day filing period *is* prescriptive. The *Louisiana Materials* lien claimant had both recorded the lien and filed suit thereon 364 days after the last supply of materials.

The Louisiana Supreme Court affirmed the Third Circuit's decision in *I.E. Miller* and reversed the Fourth Circuit's decision in *Louisiana Materials*, holding that the claims in both proceedings had *not* prescribed. In so doing, the Louisiana Supreme Court expressly overruled all inconsistent jurisprudence, including *C–Craft*. 493 So.2d at 1148.

The Louisiana Supreme Court noted the recent passage of Acts 1986 No. 191, which amended the lien act to make timely recordation necessary to preserve the privilege. 493 So.2d at 1147, n. 6. However, the Court stated that the new act did not apply to liens accrued before its enactment. *Id.* Additionally, the enactment had no bearing on the legislative intent behind the statute as it existed prior to the 1986 amendment. *Id.* The liens in the instant case accrued, and this suit was filed, before the passage of the 1986 amendment. This case is therefore governed by the law as set forth in *Louisiana Materials*.

Under *Louisiana Materials*, it is irrelevant by how much time the lien filing followed the last supply of materials, since filing of the lien itself is not even required. 493 So.2d at 1147. *See also Continental Casualty*, 310 F.Supp. at 1218. Southern complied with the only deadline set forth in The Act. The Act provides that:

Unless interrupted by suit thereon, the privilege shall prescribe and become ineffective one year from the date of recordation.

LSA–R.S. 9:4865. It is undisputed that suits on all three Southern liens were filed within one year of recordation, satisfying the requirements of LSA–R.S. 9:4865. Beyond LSA–R.S. 9:4865, there is no other prescriptive period in The Act as applicable to this case. The Court therefore finds that Southern's liens have not prescribed.

■ Southern has asked the Court to impose interest on the amounts invoiced. In pertinent part, The Act provides:

Any person who ... furnishes any ... material or supplies for or in connection with the drilling of any well or wells in search of oil, gas or water ... has a privilege ... for the amount due for such ... material, or supplies, in principal and interest....

LSA–R.S. 9:4861(B).

Additionally, the Southern invoices provide for interest at the rate of 1.5% per month or 18% per annum in the event of non-payment. Cases applying merely the legal rate of interest on oil well lien claims rely on civil code provisions that apply only where the contract is silent as to interest. *E.g., Continental Casualty, supra*, 447 F.2d at 1063. TBT does not dispute the imposition of interest, and the Court will therefore allow interest at the rate of 1.5% per month or 18% per annum from the time of original billing.

■ Southern has also asked the Court to impose attorneys fees in the amount of 10% of the principal plus interest.

The Act provides for an award of attorneys fees of 10% of the claim as a part of the remedy contained therein. LSA–R.S. 9:4861(B). The Court sees no reason why such fees should not be allowed and will therefore order that TBT pay 10% of Southern's claims in attorneys fees.

In conclusion, the Court holds that the Louisiana Oil Wells Lien Act applies to this case, that Southern's claims have not prescribed, that attorneys fees are appropriate, and that interest at the rate of 18% per

annum from date of first invoice will be taxed against TBT.