77 So.2d 216 (1955)
Mr. and Mrs. Jack RODRIGUEZ
v.
Mrs. Ethel Gillman SHRODER et al.
No. 20342.
Court of Appeal of Louisiana, Orleans.
January 3, 1955.
Rehearing Denied January 31, 1955.
Writ of Certiorari Denied March 21, 1955.
*217 Dreyfous & Kalinski, George A. Dreyfous and Edward A. Kalinski, New Orleans, for Mrs. Ethel Gillman Shroder.
Bernard Titche, Jr. and Carol B. Hart, New Orleans, for Stephen L. Guice & Co., Inc.
Elmer D. Flanders, Nicholas Masters, New Orleans, for plaintiffs-appellees.
JANVIER, Judge.
The plaintiffs alleged that, in connection with a written offer to purchase from one of the defendants, Mrs. Ethel Gillman, wife of Joseph M. Shroder, a certain piece of real estate in New Orleans, they deposited with the other defendant, Stephen L. Guice & Co., Inc., real estate agents, $1,000 and that, though the said Mrs. Ethel Gillman Shroder accepted the offer, she is unable to deliver a valid and merchantable title to the said property. They prayed for judgment against the said defendants ordering the return of the deposit ($1,000) with legal interest from judicial demand, and for all costs.
Mrs. Shroder admitted the execution of the contract for the sale of the property and that, as required by it, plaintiffs deposited $1,000 with the said real estate agent, but she denied that she is unable to transfer a valid and merchantable title to the property, and she prayed for dismissal of the suit.
Stephen L. Guice & Co., Inc., the other defendant, admitted the execution of the contract for the sale of the property and that, in connection therewith, plaintiffs deposited with it the sum of $1,000. For lack of information the Guice Company denied that the title of the defendant is not valid and merchantable. It averred that, as real estate agent, it procured the execution of the contract between the parties and that, as stipulated in the contract, it is entitled to a commission of $500, and that to secure the payment of this commission it is entitled to a lien on the deposit. It further averred that, in the alternative that the title of the defendant be held to be not valid and merchantable, then it is entitled to a judgment for $500 against the "party cast." It prayed that a copy of its answer be served upon both plaintiffs and the other defendant, and "that the matter be proceeded with as though in concursus, and that in due course a judgment be rendered herein determining the rights of all parties hereto."
The matter was tried on a stipulation as to all the facts, and there was judgment in favor of plaintiffs and against defendants ordering the return to plaintiffs of $1,000, the amount of the deposit without interest as to Stephen L. Guice & Co., Inc., but with interest at five per cent as against Mrs. Ethel Gillman Shroder. There was further judgment in favor of Stephen L. Guice & Co., Inc., and against Mrs. Ethel Gillman Shroder in the sum of $500, with legal interest *218 from judicial demand and condemning Mrs. Shroder for all costs. From this judgment she has appealed devolutively and suspensively.
As already stated, the matter was submitted on a stipulation of facts which need not be set forth in full, but from which the following facts may be noted.
The property which is involved is described as follows:
A Certain Lot or Portion of Ground, with the improvements thereon and all the appurtenances thereunto belonging, situated in the Fourth District of this City, designated by the Letter "B" in Square No. 290, bounded by Jackson Avenue, Josephine, Danneel, and Dryades Streets on a plan by Horatio L. Gilbert, Surveyor, dated April 11, 1924, according to which said lot or portion of ground commences at a distance of one hundred fifty-six feet, three inches, four lines from the corner of Danneel Street and Jackson Avenue and measures thence thirty-three feet, one inch four lines front on Jackson Avenue, the same width in the rear, by a depth of one hundred twenty feet, two inches, two lines between parallel lines and is composed of the whole of original Lot No. Three and a small portion of Lot No. Four adjoining. Said property bears the Municipal No. 1909 Jackson Avenue.
This property was listed for sale with Stephen L. Guice & Co., Inc., by Mrs. Ethel Gillman Shroder. The plaintiffs made a written offer to purchase the property for $10,000 and deposited $1,000 with the Guice Company. Mrs. Shroder accepted the offer.
The defendant, Mrs. Shroder, is the daughter of Samuel Gillman who purchased the property during the existence of the community which existed between him and his second wife, Hannah Kornitzky Gillman. Samuel Gillman had previously been married to Celia Galetzky, and from this marriage there were born two children, Mrs. Leah Gillman Melamed and Harry Gillman. From the second marriage to Hannah Kornitzky there were born three children, Mollie Gillman Ginsberg, Ida Gillman Breslaw and Ethel Gillman Shroder, the present defendant. All five of these children survived their father, Samuel Gillman. At his death in Denver, Colorado, in 1938, Samuel Gillman left a will in which he left to each of his five children $500. He named his wife, Hannah Kornitzky Gillman, as executrix and universal legatee. She judicially opened the succession, praying for the probate of the will. She prayed that she be recognized as surviving spouse in community and that, as such, she be recognized as sole owner of one-half of the community property and that, as universal legatee, she be recognized as entitled to the other half. She declined the executorship as being unnecessary, and she asked that an attorney-at-law be appointed to represent the absent heir, Mrs. Leah Gillman Melamed, who was one of the five children of Samuel Gillman and who was a resident of the Union of Soviet Socialist Republics, and she prayed that she be sent into possession of all of the property of the decedent, Samuel Gillman.
The cash legacy, $500, has never been paid to Mrs. Leah Gillman Melamed, nor deposited with the Secretary of State, nor in the Registry of the Court. There is nothing in the record to show that Mrs. Melamed has ever been actually communicated with by the attorney appointed to represent her, nor by anyone else.
Mrs. Hannah Kornitzky Gillman, the widow of Samuel Gillman, died in Denver, Colorado, on September 22, 1947. She had been married only once and then to Samuel Gillman, and she left a will in which she left her entire estate, which included the property in question, to her three children and to Harry Gillman, her stepson, who was the son of Samuel Gillman by his first marriage and was a full brother of Mrs. Leah Gillman Melamed.
It should be noted here that of the five children of Samuel Gillman all but Mrs. Leah Gillman Melamed thus inherited all *219 of the property of Mrs. Hannah Kornitzky Gillman, including the property of their father, Samuel Gillman.
Mrs. Shroder, the present defendant, was duly authorized by the other three legatees of Mrs. Hannah Kornitzky Gillman to contract for the sale of the property in question, and she did so with the result that there was executed the contract from which this suit has resulted.
It is the contention of plaintiffs that Mrs. Shroder cannot deliver to them a valid, merchantable title for the reason that there is an outstanding interest in this particular property in Mrs. Leah Gillman Melamed who has never been paid the legacy of $500 left her by her father, Samuel Gillman.
The inventory taken of the estate of Samuel Gillman showed that among the assets were two pieces of real estate, the one in question and another, and that the total value of one-half of the community estate was $3,120. It is agreed that the legitime to which each of the five children was entitled from the estate of their father, Samuel Gillman, was less than the $500 left by him to each of his children in his will. It is further stipulated that, when the property was listed with the Guice Company and when the contract was executed, the said Guice Company had no knowledge of any of the facts above set forth concerning the potential rights of Mrs. Melamed.
Counsel for defendant maintain that a claim for a legitime is one for money and not for an interest in succession property itself and that at best all that Mrs. Melamed would be entitled to, should she appear and make claim, would be to demand from Mrs. Shroder the $500 bequeathed to her by the will of her father, Samuel Gillman, and that her claim could not in any way affect adversely the title of the testamentary heirs of Mrs. Hannah Kornitzky Gillman to the property in question, and particularly that her claim could not adversely affect the title of plaintiffs should the property be transferred to them by Mrs. Shroder.
It is also argued that since, within three months after the opening of the succession of Samuel Gillman, Mrs. Melamed did not record her claim for separation of patrimony, she has no claim which can, in any way, affect the title to the property which formed part of the estate of her deceased father.
It is also asserted that, in any event, since more than ten years elapsed between the death of Samuel Gillman and the filing of this suit, any claim which Mrs. Melamed may have had, has been lost by the prescription of ten years. And it is also contended that the prescription of five years, which is provided by Article 3542 of the LSA-Civil Code for the reduction of an excessive donation is applicable here and that, because of this prescription also Mrs. Melamed, should she appear, would have no right which she could assert against this property.
The contention of plaintiffs, on the other hand, is that Mrs. Melamed was a forced heir of their father and that she, as such, acquired her right to her legitime, not as a result of his testament, but as a result of law, and that the mere fact that her father named her as a legatee for an amount as great as or greater than the legitime, did not divest her of her rights as a forced heir and relegate her to the position of a legatee.
There can be no doubt at all that had Samuel Gillman left no will, Mrs. Melamed, as the result of Article 942 of the LSA-Civil Code, would have been considered seized of the succession from the moment of its being opened and that, because of the effect of Article 1607 of the LSA-Civil Code, she, as a forced heir, would, up to the extent of her legitime, have been "seized of right * * * of all the effects of the succession * * *."
Had there been no will of Samuel Gillman, surely it could not have been contended that Mrs. Melamed would have been deprived of any of her rights because of her failure to record her claim within three months of the opening of the succession as is required of a legatee by Article 3275.
The right to the legitime and all of the incidental rights which go with it are, under *220 our laws, sacred and forced heirs cannot be deprived of them.
Surely then the decedent could not, by the mere making of a will in which he named a child as a legatee, deprive the child of any rights which, as a forced heir, she would have had, had there been no will.
In their contention that the only right which Mrs. Melamed would have, in the event of her reappearance, would be to claim of Mrs. Shroder $500 and that her claim could in no way affect the title to the property, counsel for Mrs. Shroder confidently rely upon four decisions of our Supreme Court. They are: Cazebonne v. Caldbeck, 156 La. 723, 101 So. 119; Stockwell v. Perrin, 112 La. 643, 36 So. 635; Griffith v. Alcocke, 113 La. 514, 37 So. 47; and Miller v. Miller, 105 La. 257, 29 So. 802.
From none of these cases should defendant derive any comfort and one of them, Stockwell v. Perrin, clearly shows that, such a right as Mrs. Melamed would be entitled to assert, affects the property itself to such an extent that if necessary the property might be seized and sold to satisfy her claim.
In Cazebonne v. Caldbeck, supra [156 La. 723, 101 So. 120], the heir who had inherited the real estate had not paid the particular legacies. These legacies were not to forced heirs. The Court said:
"It does not appear affirmatively that Mrs. White has ever paid any of the legacies as directed by her father in his last will, but it does appear that no creditor or legatee has ever recorded any claim against the property."
And the Court further said that though, as a result of Article 1633 of our Code, the heirs of a testator are personally bound to discharge the legacies and are bound "`by mortgage for the whole, to the amount of the value of the immovable property of the succession withheld by them'", nevertheless because of the effect of Article 3275, this mortgage does not result unless the creditor or legatee shall have recorded the claim within three months of the opening of the succession. But there, there were no forced heirs and the claims which the heirs had resulted solely from the testament of the deceased and not from the effect of law.
Stockwell v. Perrin, supra [112 La. 643, 36 So. 637], is confidently relied on as holding that whatever claim the heir may have, so long as the property is not transferred to a third person, that claim can no longer affect the property after its transfer to a third person. Counsel point to the following statement which appears in that opinion:
"We pretermit any discussion as to what the legal situation would have been between the parties had the property involved in this litigation been held by the original donee under her act of donation.
"Such is not the situation here.
"The defendant in this case is not the donee, but a third possessor, and it is with the rights and obligations of parties arising under that condition of affairs that we are called upon to deal."
This language, were it not for what appears later in the opinion, might seem to indicate that the Supreme Court was of the opinion that, should the property be transferred to a third person, the forced heir would lose all rights which might affect the property itself. But the Supreme Court did not stop with that statement but continued with a further one which completely annihilates this particular contention of defendant. There the Court was dealing with the question of whether the rights of forced heirs could affect title to real estate forming part of the estate to which they were heirs and which real estate had been transferred to third persons. The Court plainly said that the third persons might retain the title, but that the claim of the heirs to their legitime must be satisfied either in cash by payment of the amount of the legitime or by the seizure and sale of the property in the event the owner of the *221 property should fail to pay the legitime. Note the following:
"* * * The right of the plaintiffs is to call for payment to the amount needed to secure them their legitime from the third possessor to the extent of the value of this property should they elect to pay the same, or to enforce their right through a forced sale thereof should they refuse to make such payment. The enforcement of their legitime being secured in their favor by a priority and preferencea right higher than a mortgage or privilege; a right resulting from the very tenure under which the third possessors own the property. [People's] Bank [of New Orleans] v. David, 49 La.Ann. [136], 143, 21 So. 174. The property passed out of the ownership of Mrs. Cane into that of Mary Hatkinson subjected to and subordinated to the right reserved by law in favor of the forced heirs (should one have existed), to be so paid or enforced. The property passed from Mary Hatkinson to the later successive purchasers under an ownership also subordinated to the same right of the forced heirs."
Similarly here it seems clear to us that should the plaintiffs take title to this property and should Mrs. Melamed appear and make claim for her legitime, she could present that claim to the plaintiffs, and, in the event of their failure to pay to her the amount of her legitime, then she could enforce her right to her legitime by a forced sale of the property.
In Miller v. Miller, 105 La. 257, 29 So. 802, 804, the Supreme Court held that a grandchild whose father had died before the death of the testator and who was therefore a forced heir by representation must, in determining the amount of her legitime, be given credit for a special legacy and also for a sum which the testator grandfather had given to the father of the grandchild prior to the death of either. Counsel for defendant point to certain language used by the Court as evidencing a holding that the claim of a forced heir for its legitime cannot affect the title to property inherited by other heirs. The Court said that the law does not, by the force of its own will,
"immediately, by the fact of death, transfer a portion of the estate to what are known as `forced heirs' it will be observed that articles 1493 [1494 and] 1495 of the Revised Civil Code do not purport to make any changes in the ownership of the property of the testator, and simply prohibit him from disposing of it to a certain extent `to the prejudice of heirs' holding certain relations to the deceased. He is at liberty to dispose of the whole property, subject, however, to the right of these heirs, if they feel themselves aggrieved, to have the will set aside to the extent necessary to secure to them, as forced heirs, the legal portion coming to them. * * *"
But the Court also said that the action of a testator in disposing of his property is subject to attack by forced heirs "under proper conditions and circumstances," when the portion of the forced heirs is "legally claimed and established."
Surely it cannot be denied that, should Mrs. Melamed appear and make claim, she could "legally" claim and establish it and that there would then be presented "proper conditions and circumstances".
As a matter of fact, the question which was really presented in the Miller case was not whether the claim of a forced heir would affect title to property left to the decedent, but was whether a forced heir who also was given a special legacy must be charged with the special legacy in determining the amount of the legitime and must also be charged with a sum which had been "given" to her father by the testator before the death of the father. The Court held that, under the conditions shown there and under the wording of the testament, the legitime of the forced heirs was charged with the special legacy and with the sum which had been given to the father before his death.
*222 The facts in Griffith v. Alcocke, 113 La. 514, 37 So. 47, 50, provide a clear distinction. That was a contest between forced heirs and creditors of the father of the forced heirs. The father had donated his interest in certain property to his mother. The mother and the son had then mortgaged the property to secure debts owed by the father to certain creditors. The property was sold under foreclosure proceedings and one of the mortgage creditors bought it in at the foreclosure sale. An effort was made by a forced heir to set aside the sale on the ground that the donation by the father had affected an impingement upon the rights of his children as forced heirs. The Supreme Court upheld the rights of the creditors as against the forced heirs, saying:
"There must exist an exceptional condition of affairs which would cause the claims of creditors to be primed by those of heirs. We do not think such a condition of affairs existed in this case at the time the act purporting to be an act of donation was executed, and at the time the two acts of mortgage were granted. At that time the children had no vested right whatever to the property. Their rights touching the same were purely future, contingent and possible. The claims of the creditors, on the contrary, were then actually existing, and all his property was then the pledge of his creditors. The property, so far as the children were concerned, could be legally made available for the payment of existing debts of the father, and, if this was in point of fact done, the children had no ground for complaint. It would be subordinating substance to form to permit them to recover property which followed as to its actual destination and application the course which the law made it right and proper for it to have then taken. The situation by reason of which alone their ground of complaint could arise was that third parties having claims legally subordinate to their own should have been benefited by gratuities to them. That was not the case here. Mrs. Durham was not benefited a dollar by this property. It became affected by mortgage, before the father's death, in favor of parties holding just claims against him, and the entire proceeds of the property went to them. There was no partiality shown by their father to the parties having rights and claims inferior to their own; no avoidance by him of his duty as a parent. It is by no means certain that the mortgage creditors could not themselves have had the act of donation set aside, and the actual facts developed, had not the precise course been followed which was taken. These creditors of the father having acquired before his death fixed rights upon the property, their rights were not lost by the mere fact of their debtor's death. When the debtor died the creditors were already in a secured position. * * *"
The contention of defendant that Mrs. Melamed lost whatever right she may have had because she did not appear within five years of the opening of the succession of Samuel Gillman and institute some action for the reduction of the legacy to Mrs. Hannah Kornitzky Gillman is based upon the theory that Mrs. Melamed is contending that she has been deprived of some part of her legitime because the balance of the estate which went to the universal legatee exceeded the disposable portion, with the result that there did not remain in the estate sufficient assets out of which the legitime of Mrs. Melamed might be paid to her.
When, because of excessive donations, there does not remain in the estate sufficient assets to meet the legitime of forced heirs, their remedy is to bring an action for the reduction of the excessive donations and, because of the effect of Article 3542 of the LSA-Civil Code, such an action must be brought within five years.
But this is not an action for their reduction of an excessive donation. The amount left by the testator, Samuel Gillman, to Mrs. Melamed was sufficient to cover her legitime and that amount was withheld *223 from her, not because too much was left to the universal legatee, but because the universal legatee, without any legal right, had herself placed in possession of the entire estate without paying from its assets the amount due to Mrs. Melamed.
Nor can we agree that such rights, as Mrs. Melamed may have had, have been lost by the prescription of ten years. On the death of her father she, along with the other forced heirs, became seized of his estate. So long as she did not renounce her inheritance, there remained extant in her the right to accept. She did not renounce, and therefore the right to accept still exists and might be exercised by her should she appear.
In Stockwell v. Perrin, supra, the Supreme Court considered and discussed just such a contention, saying:
"It is claimed that the third possessors have acquired the ownership of the property by the prescription of 10 years, but this position is not maintainable. These parties having acquired, quoad the forced heirs, to the extent of the legitime merely, an imperfect ownership in the property subjected to their right, held their right to absolute ownership in the same constantly held in suspense until the delays accorded by law to the forced heirs should have been reached and passed."
In Generes v. Bowie Lumber Co., 143 La. 811, 79 So. 413, 417, the Supreme Court said:
"How can it be said then, that a forced heir, who is invested with the right of possession of the property of the succession by operation of law and without having to accept the succession, loses `the faculty of accepting' by the prescription of 30 years?"
See, also Dileo v. Dileo, 217 La. 103, 46 So.2d 53, 56, in which the Supreme Court said:
"Defendants contend that plaintiffs did not accept the succession of Santo Dileo within thirty years from his death in 1914 and therefore they must be considered to have renounced it. In support of the proposition, the case of Schultze v. Frost-Johnson Lumber Co., 131 La. 956, 60 So. 629 is cited.
"The point is not tenable. It is the firmly established jurisprudence that forced heirs do not lose by prescription their right of inheritance in failing to accept the succession within thirty years because, if they have not renounced it, they are presumed to have accepted it. Le mort saisit le vif. Articles 940, 941, Civil Code; Generes v. Bowie Lumber Co., 143 La. 811, 79 So. 413; Bendernagel v. Foret, 145 La. 115, 81 So. 869; Dew v. Hammett, 150 La. 1094, 91 So. 523 and Tillery v. Fuller, 190 La. 586, 182 So. 683. The obiter dictum to the contrary in Schultze v. Frost-Johnson Lumber Co., supra, upon which defendants depend, was based on the ruling in Succession of Waters, 12 La.Ann. 97, which was specifically overruled in Generes v. Bowie Lumber Co., supra."
And in one of the most famous cases decided by the Supreme Court of Louisiana or by the Supreme Court of the United States, Gaines v. City of New Orleans, 6 Wall. 642, 73 U.S. 642, 18 L.Ed. 950, the Supreme Court of the United States said:
"Courts, in the administration of justice, have rarely had to deal with a case of greater hardship, or more interesting character and history, then the one we are now considering. Daniel Clark, a prominent citizen of Louisiana in its early history, died in New Orleans in 1813, leaving by will his large estate to the complainant, then a child of tender years, who has never enjoyed it, but is now, after the lapse of fifty-five years from the death of her father, struggling to get it. * * *"
The Court reaffirmed its decision in Gaines v. Hennen, 24 How. 553, 65 U.S. 553, 16 L.Ed. 770, holding that prescription did not prevent the presentation of her claim.
*224 Finally, on behalf of defendants, it is argued that the plaintiffs were not justified in refusing to take title to the property, for the reason that even if there does exist in Mrs. Melamed, should she appear, a right which might affect the title to the property, the chance of her appearing is so remote that it cannot be said that serious litigation is suggested.
It is true that it has been held that in order that a prospective purchaser may be relieved of the obligation to take title to real estate which he has agreed to buy, it must appear that the title of the prospective vendor is suggestive of "serious" litigation. However, we cannot agree that no such danger exists here. There still remains the possibility of the return of Mrs. Melamed in person or by proxy, and, human nature being what we know it to be, there is a reasonable certainty that should she return she would take steps to secure her legitime. In her effort to accomplish this, she could claim from the then owner of the property the payment of the legitime and, in the event of the owner's unwillingness to make payment, she could look to the property itself.
While the amount involved is comparatively small, it cannot be said that because of this fact the danger of litigation is not serious. No one can be forced to buy a lawsuit or to take property against which there may be presented a claim which the purchaser may be required to pay.
One further contention remains. In the brief of defendant it is said that the purchase price of the property, $10,000 is substantially more than the amount of the legitime of Mrs. Melamed and that therefore it would be a simple matter for the prospective purchasers to deduct the amount of the legitime from the purchase price, to withhold this amount and to pay Mrs. Melamed should she appear.
In support of this contention counsel for defendant cite Jaenke v. Taylor, 160 La. 109, 106 So. 711, 714 in which the Supreme Court said:
"* * * it is well settled that a mortgage on the property forms no legal justification for refusing to accept title where the price agreed to be paid for the property is more than sufficient to satisfy the mortgage debt."
Counsel in their brief say:
"* * * obviously a $500 mortgage could readily be paid out of a $10,000 sale price. See also, Le Goaster v. Lafon Asylum, 1924, 155 La. 158, 99 So. 22."
Even if Mrs. Melamed were here and would indicate willingness to undertake this rather complicated procedure, it is not shown that the defendant is willing to allow the deduction from the purchase price of the necessary amount.
As to the claim of Stephen L. Guice & Co., Inc., for the commission claimed to be earned as a result of services in bringing the parties together, it seems quite clear that that corporation is entitled to demand its commission from someone. It is agreed that at the time of the listing of the property, and at the time of the execution of the contract, the Guice Company had no knowledge of any possible defect in the title which Mrs. Shroder agreed to deliver.
In her acceptance of the offer of plaintiffs, Mrs. Shroder agreed to pay the commission of the agent which was fixed at five percent of the purchase price. There was a provision in the contract to the effect that if the title should be held not valid, nevertheless the commission would be paid by the vendor. Since the title is defective to the extent of the possible claim of Mrs. Melamed and since, for that reason, the purchasers are relieved of the obligation to take title, it was proper that their deposit should be returned to them, and since the Guice Company fully performed the services which were required of it, it is equally clear that the commission has been earned and must be paid by the vendor, Mrs. Shroder.
The judgment appealed from is affirmed at the cost of appellant.
Affirmed.