# STATE OF LOUISIANA

# COURT OF APPEAL, THIRD CIRCUIT

## 17-78

**LYDIA DEGUEYTER**

**VERSUS**

**FIRST AMERICAN TITLE COMPANY**

**\*\*\*\*\*\*\*\*\***
**APPEAL FROM THE**
**SIXTEENTH JUDICIAL DISTRICT COURT**
**PARISH OF ST. MARTIN, DOCKET NO. 83328**
**HONORABLE KEITH R. J. COMEAUX, PRESIDING**
**\*\*\*\*\*\*\*\*\***

**SYLVIA R. COOKS**
**JUDGE**

**\*\*\*\*\*\*\*\*\***

Court composed of Sylvia R. Cooks, Shannon J. Gremillion, and Van H. Kyzar, Judges.

**REVERSED, RENDERED, AND REMANDED.**

**Gremillion, J., concurs and assigns written reasons.**

Jonathan R. Villien
William W. Stagg
Durio, McGoffin, Stagg & Ackermann, P.C.
220 Heymann Boulevard
Lafayette, LA 70503
(337) 233-0300
**ATTORNEY FOR PLAINTIFF/APPELLANT**
 Lydia Degueyter

Steven W. Copley
Phillip J. Antis, Jr.
Alex B. Rothenberg
Michael J. Fussell, Jr.
Gordon, Arata, Montgomery, Barnett, McCollam, Duplantis & Eagan, LLC
201 St. Charles Ave., 40th Floor
New Orleans, LA 70170-4000
(504) 582-1111
**ATTORNEY FOR DEFENDANT/APPELLEE**
 First American Title Insurance Company of Louisiana

**COOKS, Judge.**

On August 1, 2014, Lydia Degueyter and her brother-in-law, Charles Faul, acquired through a cash sale a one hundred percent undivided interest in a tract of land located on Snapper Road in New Iberia, Louisiana. The act of cash sale listed Nationwide Mortgage, LLC as the seller, and Lydia and Charles as the buyers. The listed price was $143,325.00. The act of cash sale was signed and notarized on August 1, 2014, although it was not filed into the Iberia Parish conveyance records until September 3, 2014, at 4:09 p.m.

In connection with the cash sale, on September 3, 2014, Lydia and Charles purchased a title insurance from First American Title Insurance Company. The policy specified that "[t]itle is vested in" Lydia and Charles. According to the record, the policy was effective "09/03/2014 @ 04:09 p.m. or the date of recording, whichever is later." Lydia and Charles were both listed as insureds under the policy.

Charles also transferred his entire undivided interest to Lydia by a donation inter vivos, which according to the donation was "done and passed in Lafayette Parish, Louisiana, on the 2nd day September, 2014." The donation was properly recorded with the Iberia Parish Clerk of Court on September 3, 2014 at 4:09 p.m. at the same exact time the act of cash sale was recorded and the First American policy went into effect.

In April of 2015, Lydia attempted to obtain financing from Farmers Merchants Bank & Trust Company (hereafter FM Bank), using the property on Snapper Road as collateral. However, her application for financing was denied by FM Bank due to the presence of multiple judgments attached to the property. Upon further investigation, Lydia discovered the recordation of ten judgments or tax liens in favor of third parties against Charles and his various business entities, which attached to the property upon his acquiring an interest therein.

2

Shortly after discovering the judgments on the property, Lydia contacted First American seeking coverage through the title policy. First American denied the claim. On November 13, 2015, Lydia filed suit against First American seeking coverage under the title insurance policy purchased on September 3, 2014. In conjunction with the filing of suit, Lydia filed a Motion for Summary Judgment, arguing there was no genuine issue of material fact as to coverage in her favor under the policy. Lydia argued she has never held marketable title to the property due to the encumbrances on the property and this was an insurable risk under the plain language of the policy.

First American responded and filed a Cross Motion for Summary Judgment. It argued, as a matter of law, that Lydia had no claim against First American under the title insurance policy because the policy insured Lydia as to her interest as co-owner, and the judgments against Charles did not encumber and had no effect on her ownership interest.

Both motions for summary judgment were set for hearing on August 1, 2016. Following the hearing, the trial court granted First American's motion for summary judgment and denied Lydia's motion for summary judgment. In its written reasons for judgment, the trial court found Charles' "judicial mortgages and liens attached only to his one-half interest in the Snapper property because that is all he owned." The trial court further found "Lydia has clear and unencumbered title on her undivided one-half interest in the Snapper immovable property that she originally obtained when she purchased the property with Charl[es] . . . [and] title on her undivided one-half interest in the Snapper property was the interest first insured by First American." The trial court then concluded "any judgment granting Lydia relief as requested would force [First American] to pay a claim that did not exist at the date of the policy."

3

Lydia has appealed the trial court's judgment, asserting the following assignments of error:

1. The trial court manifestly erred in finding that [Charles'] outstanding judgments and liens which attached to the immovable property subject to the title insurance policy at issue did not cause the title to the property to be unmarketable as of the date of the policy, an insurable risk under the policy, and therefore that there was no coverage for [Lydia].

2. The trial court manifestly erred in finding that [Lydia's] interpretation and construction of the applicable language of the title insurance policy at issue was not reasonable.

## ANALYSIS

Summary judgments are reviewed de novo on appeal and the reviewing court is governed by the same criteria as the trial court in determining whether the mover is entitled to judgment as a matter of law. *Schroeder v. Board of Supervisors*, 591 So.2d 342 (La.1991). Summary judgment is appropriate when there remains no genuine issue as to material fact and the mover is entitled to judgment as a matter of law. La.Code Civ.P. art. 966. Summary judgments are now favored in Louisiana and shall be construed to accomplish the ends of just, speedy, and inexpensive determination of allowable actions. La.Code Civ.P. art. 966.

The mover bears the burden of proof. La.Code Civ.P. art. 966. Once the mover has made a prima facie showing that the motion shall be granted, the burden shifts to the adverse party to present evidence demonstrating that material factual issues remain. *Luther v. IOM Company, LLC*, 13-353 (La. 10/15/13), 130 So.3d 817. If the adverse party fails to do so, there is no genuine issue of material fact and summary judgment will be granted. *Id.*

The parties largely agree on the facts of this case. The issue herein is the interpretation and application of the title insurance policy issued by First American. "Interpretation of an insurance policy usually involves a legal question

4

that can be properly resolved in the framework of a motion for summary judgment." *Kirby v. Ashford*, 15-1852, p. 5 (La.App. 1 Cir. 12/22/16), 208 So.3d 932, 936-37 (citing *Bonin v. Westport Ins. Corp.*, 05-886 (La. 5/17/06), 930 So.2d 906).

In interpreting an insurance contract, we are mindful "that an insurance policy is a contract between the parties and should be construed using the general rules of interpretation of contracts set forth in the Civil Code." *Sims v. Mulhearn Funeral Home, Inc.*, 07-54, p. 7 (La. 5/22/07), 956 So.2d 583, 588-89. Under La.Civ.Code art. 2046, "[w]hen the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent."

Courts must determine the intent of the parties when interpreting an insurance policy. La.Civ.Code art. 2045. Insurance policies should be interpreted to effect coverage, not deny coverage. *Yount v. Maisano*, 627 So.2d 148 (La.1993). An exclusion from coverage should be narrowly construed. *Breland v. Schilling*, 550 So.2d 609 (La.1989). An insurance policy should not be interpreted unreasonably or in a strained manner in an attempt to enlarge or restrict its provisions beyond what is reasonably contemplated by its terms or so as to achieve an absurd result. *Bernard v. Ellis*, 11-2377 (La. 7/2/12), 111 So.3d 995; *Graphia v. Schmitt*, 08-613 (La.App. 5 Cir. 1/13/09), 7 So.3d 716.

Lydia maintains that the trial court manifestly erred in this case because title to the immovable property was unmarketable from the inception of the issuance of the title insurance policy by First American. She argues the encumbrances of the property due to the judgments against Charles rendered the property unmarketable under the policy, which is a risk insured under the language of the policy.

5

The First American policy listed the following under the heading "**COVERED RISKS:**"

1. Title being vested other than stated in Schedule A.
2. Any defect in or lien or encumbrance on the Title. This Covered Risk includes but is not limited to insurance against loss from
   (a) A defect in the Title caused by
       (i) forgery, fraud, undue influence, duress, incompetency, incapacity, or impersonation;
       (ii) failure of any person or Entity to have authorized a transfer or conveyance;
       (iii) a document affecting Title not properly created, executed, witnessed, sealed, acknowledged, notarized, or delivered;
       (iv) failure to perform those acts necessary to create a document by electronic means authorized by law;
       (v) a document executed under a falsified, expired, or otherwise invalid power of attorney;
       (vi) a document not properly filed, recorded, or indexed in the Public Records including failure to perform those acts by electronic means authorized by law; or
       (vii) a defective judicial or administrative proceeding.
   (b) The lien of real estate taxes or assessments imposed on the Title by a governmental authority due or payable, but unpaid.
   (c) Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete survey of the Land. The term "encroachment" includes encroachments of existing improvements located on the Land onto adjoining land, and encroachments onto the Land of existing improvements located on adjoining land.
3. *Unmarketable Title.*
4. No right of access to and from the Land.

(Emphasis added.)

Black's Law Dictionary defines "merchantable" as "fit for sale in the usual course of trade at the usual selling prices" and further indicates marketable as the predominant term for "merchantable." "Property has a merchantable title when it can be readily sold or **mortgaged** in the ordinary course of business by reasonable persons familiar with the facts and questions involved." *Young v. Stevens*, 209 So.2d 25, 27 (La. 1967). This court in *Vallery v. Belgard*, 379 So.2d 1201, 1204 (La.App. 3 Cir. 1980), cited with approval the court's discussion of merchantable title in *Young*, 209 So.2d at 27:

Property has a merchantable title when it can be readily sold or mortgaged in the ordinary course of business by reasonable persons familiar with the facts and questions involved. *Roberts v. Medlock*, 148 So. 474 (La.App.1933). "[O]ne should not be made to accept a title tendered as good, valid and binding unless it is entirely legal from every point of view." *Bodcaw Lumber v. White*, 121 La. 715, 721, 46 So. 782, 784 (1908). The promisee in a contract to sell is not called upon to accept a title which may reasonably suggest litigation. *Marsh v. Lorimer*, 164 La. 175, 113 So. 808 (1927). And while the amount involved may be small, "it cannot be said that because of this fact the danger of litigation is not serious. No one can be forced to buy a lawsuit . . ." *Rodriguez v. Schroder*, 77 So.2d 216, 224 (La.App.1955).

As Lydia notes, Louisiana law only requires that a plaintiff seeking to recover on the basis of unmerchantable title "must show that third persons (not parties to the action) might thereafter make claims of a substantial nature against the property, and thereby subject the vendee to serious litigation." *Langford Land Co. v. Dietzgen Corp.*, 352 So.2d 386, 388-389 (La.App. 4 Cir. 1977) (citing *Kay v. Carter*, 243 La. 1095, 150 So.2d 27, 29 (1963) and *Pesson Plumbing and Heating Co., Inc. v. Hammonds*, 160 So.2d 769 (La.App. 3 Cir. 1964)).

The record showed that the judicial mortgages and liens adverse to Charles preexisted his acquisition of the property in question, and were certainly attached to the subject property on September 3, 2014 at 4:09 p.m., which was the effective date of the policy. It is also clear from the record that Charles' judicial mortgages and liens attached to the property as far back as August 1, 2014, when the cash sale was signed by the parties and notarized. While the consent of all co-owners is required for the establishment of a conventional mortgage, a judicial mortgage, such as burdened the property in question here, attaches without consent. Therefore, we find that the property was burdened with Charles' judicial mortgages and liens well in advance of the issuance of the First American policy.

It is pertinent to note that the act of cash sale signed and notarized on August 1, 2014, listed Delta Title Corporation as the preparer of the form and the returnee on the act of cash sale. We glean from the face of the policy that Delta Title was

7

also the issuing agent for First American on the policy in question issued to Lydia. Therefore, it is clear that Delta Title was aware of the purchase of the property from August 1, 2014.

Our review of the record convinces us that the encumbrances on the property rendered Lydia's title, from its inception, unmarketable. This was clearly an insurable risk under the language of the First American policy with Lydia. The policy clearly states that unmarketability and encumbrances on the title as of the date of the policy are insured risks. The record establishes as of the date of the policy, the property had been acquired by Charles and donated to Lydia. The donation was *executed* the day before the issuance of the policy, and filed contemporaneously with the issuance of the policy.

First American argues it is not required to pay under its policy because Lydia has clear and unencumbered title on her *undivided one-half interest* in the Snapper Road property and this title on her undivided one-half interest was the interest that was first insured by First American. In support of this argument it cites the case of *McSwain v. Bryant*, 503 So.2d 605 (La.App. 1 Cir. 1987). In that case, a divorcing couple chose not to partition their immovable community property and became co-owners in indivision. The husband later executed a collateral mortgage on properties that he still co-owned with his ex-wife. The husband became delinquent on the mortgage payments and judgments attached. The *McSwain* court noted that an "owner in indivision can grant a mortgage over his undivided interest in property and that this interest can be seized and sold to satisfy the mortgage." *Id.* at 607. The court did note "[t]o the extent that the collateral mortgage purported to extend over [the ex-wife's] undivided interest in the property it was ineffective. However, as to [the husband's] interest, the mortgage was valid and enforceable." *Id.*

8

We find *McSwain* distinguishable in the present case, as it does not involve title insurance or judicial mortgages and in no way addresses the key issue of the marketability of the Snapper Road property. It merely discusses the rights of owners in indivision, noting an owner in indivision can grant a conventional mortgage over his or her undivided interest in the property.

Moreover, we find First American's argument that the encumbrances only affected Charles' interest in the property and his title ignores the stark reality that third parties possess outstanding rights of a "substantial nature against the property," which effectively renders title in the property unmarketable. See *Bart v. Wysocki*, 558 So.2d 1326 (La.App. 4 Cir. 1990). Lydia's title to the property in reality was unmarketable as of the time the policy went into effect. As Lydia notes, the rights of the judgment creditors against the property are substantial, irrespective of First American's contention that the encumbrances only affected Charles' interest in the property and his title. We note nothing in the policy distinguishes between Lydia's title and Charles' title and only one premium was charged. The policy states that it "insures, as of Date of Policy. . . against loss or damage. . . sustained or incurred by the Insured by reason of: . . . 3. Unmarketable Title." The policy then defines "Unmarketable Title" as follows:

> Title affected by an alleged or apparent matter that would permit a prospective purchaser or lessee of the Title or lender on the Title to be released from the obligation to purchase, lease or lend if there is a contractual condition requiring the delivery of marketable title.

Clearly, as of the date of the policy, there were multiple encumbrances on the property (Charles' judicial mortgages and liens), which would allow for a prospective purchaser, lessor or lender to be released from any obligation to purchase, lease or lend, as there was not marketable title on the property. This was evidenced when FM Bank refused to approve Lydia's request for financing due to the encumbrances. Thus, it is clear the

9

property could not "be readily sold or mortgaged in the ordinary course of business." *See Young*, 209 So.2d at 27. We agree with Lydia that the concept of marketability as addressed in the jurisprudence is consistent with the policy's definition of "unmarketable title," and is thus an insurable risk under the plain terms of the First American policy. We note the trial court's written reasons for judgment do not address the issue of marketability of the property. As the policy clearly lists marketability of the property as a covered risk, it was error for the trial court not to address that issue.

First American argues that the "policy does not cover defects, liens, encumbrances, adverse claims, or other matters attaching or created *subsequent to the Date of Policy*." We agree with Lydia that the record establishes the judicial mortgages and liens adverse to Charles preexisted his acquisition of the subject property and, thus, attached to the property prior to the date and time of the policy's issuance. As set forth earlier, there is nothing in the record to indicate Lydia was aware of the encumbrances on the subject property prior to her application for financing with FM Bank. Thus, we find the exclusion cited by First American inapplicable as the encumbrances and liens were not created "subsequent to the Date of the Policy."

First American also argues that coverage is excluded under the policy because the judicial mortgages which attached to the property were "created, suffered, assumed, or agreed to by the Insured Claimant." First American offered no evidence to establish that Lydia "created, suffered, assumed, or agreed" to the establishment of Charles' judicial mortgages, nor did it offer any evidence that she agreed to their attachment to the property. Moreover, as Lydia notes, since "Insured Claimant" refers to the insured claimant who actually claims loss or damages, Charles would not be considered the

10

"Insured Claimant" here as he is not claiming loss or damage. We find this exclusion is not applicable herein.

## CONCLUSION

As set forth above, we find the Snapper Road property was unmarketable as of the effective date of the First American policy. As this was a covered risk under the language of the policy, we reverse the judgment of the trial court granting First American's motion for summary judgment denying coverage under its policy. Judgment is hereby rendered granting Lydia Degueyter's motion for summary judgment that there is coverage under the First American policy. The matter is hereby remanded to the trial court for further proceedings consistent herewith. Costs of this appeal are assessed against defendant, First American Title Insurance Company.

**REVERSED, RENDERED, AND REMANDED.**

LYDIA DEGUEYTER

VERSUS

FIRST AMERICAN TITLE COMPANY

**Gremillion, J., concurs for the following reasons:**

I am not swayed by First American's arguments regarding timing. It did not issue this title policy after considering when and how Charles's various liens and judgments would attach to the subject property; it simply was unaware of their existence. It was First American's obligation to discover the liens and judgments that affect the property to which they are insuring marketable title.

Similarly, I am not sympathetic to First American's technical arguments that attempt to obviate the reality that this property is not marketable. A title insurance policy exists to cover the risk that the insured property owner does not have an unmarketable title, subject to the encumbrances of its former owners. Accordingly, I must agree with the majority.

That having been said, I can only concur with my colleagues for two reasons. First, the majority finds that:

> '…since "Insured Claimant" refers to the insured claimant who actually claims loss or damages, Charles would not be considered the "Insured Claimant" here as he is not claiming loss or damage. We find this exclusion is not applicable herein.'

This finding creates an incentive for abuse of the donative process between co-buyers. An encumbered co-buyer simply donates his portion of the property to other co-buyers, allowing for a convenient insurance claim for the remaining "insured claimant."

Secondly, and specifically to this case, had Lydia bought this property without Charles, she would be the only owner as she is today. But, because Charles stepped in as co-buyer and then stepped out almost immediately as donor, Lydia gets the same ownership of the same property at the same price, and gets to make a claim on this insurance policy. I can see no good reason for this contrivance.

The majority points out in the first line of the opinion that Charles and Lydia are part of the same family, but proceeds as though that fact was irrelevant. I cannot conclude that Lydia was unaware of the existence of not one or two, but ten, encumbrances against Charles. And, if she did not know, she could have simply asked her brother-in-law about his fitness to be a co-owner of immoveable property.

Nevertheless, it is true that First American failed to offer any proof of Lydia's knowledge of Charles's indebtedness. Thus, even though Lydia was better-positioned to avoid this problem, I am constrained by the policy language and the record before me. Therefore, I concur.